THE MARTHA GRAHAM SCHOOL AND DANCE FOUNDATION, INC. and Ronald A. Protas, individually and as Trustee of the Martha Graham Trust Plaintiffs,

v.

MARTHA GRAHAM CENTER OF CONTEMPORARY DANCE, INC., Martha Graham School of Contemporary Dance, Inc., Todd Dellinger, Francis Mason, Jayne Millard Clark, Marvin Preston IV, Judith Schlosser, Robert N. Solomon, and Delores Weaver, Defendants.

Eliot Spitzer, Attorney General of the State of New York, Intervenor–Defendant.

No. 01 Civ. 271(MGC).

United States District Court, S.D. New York.

Aug. 7, 2001.

---

White & Case LLP, New York City by James J. McGuire, Cyrus Benson, Alan Blum, Timothy McCarthy, for Plaintiffs.

O'Melveny & Myers LLP, New York City by Dale M. Cendali, Claudia Ray, Louis B. Kimmelman, Samuel M. Leaf, for Defendants Martha, Graham Center of Contemporary, Dance, Inc. and Martha Graham School of Contemporary Dance, Inc.

Davis Wright Tremaine LLP, New York City by Victor A. Kovner, Matthew A. Leish, for Defendants Todd Dellinger, Jayne Millard Clark, Marvin Preston IV, Judith Schlosser and Delores Weaver.

Frankfurt, Garbus, Kurnit, Klein & Selz, PC, New York City by Martin Garbus, for Defendant Robert N. Solomon.

Eliot Spitzer, Attorney General of the State of New York, New York City by Marla G. Simpson, Barbara L. Quint, Charles H. Smith III, for Intervenor–Defendant.

## OPINION

CEDARBAUM, District Judge.

The sole heir of Martha Graham and his assignees sue the Martha Graham Center of Contemporary Dance and the Martha Graham School of Contemporary Dance to enjoin them from using the names under which they were incorporated and have operated since 1948 and 1956, respectively, and to enjoin them from calling what they teach the "Martha Graham technique." Martha Graham, the great pioneer of modern dance, died in 1991 at the age of 96. In 1993, Ronald Protas, her testamentary legatee, applied for trademark registration of "Martha Graham" and "Martha Graham technique." Plaintiffs assert claims of trademark infringement, unfair competition and dilution against the Martha Graham School and the Martha Graham Center. They also assert a variety of claims against these defendants and a number of their directors, as well as a former employee.

Preliminary and final injunctive relief were consolidated with the consent of the parties pursuant to Fed.R.Civ.P. 65(a)(2), and plaintiffs' injunction claims were separated for trial pursuant to Fed.R.Civ.P. 42(b). After expedited discovery, a bench trial was held between March 21 and April 18, 2001.[1] After careful consideration of the evidence, injunctive relief is denied for the reasons that follow.

---

1. To accommodate plaintiffs' request for additional time to conduct discovery concerning various issues which arose during the course of the trial, the trial was adjourned from March 27 to April 16.

Since there is no just reason for delay in entering judgment on plaintiffs' claims for injunctive relief, the clerk is directed to enter judgment for defendants dismissing Claims One, Two, Three and Four. The other claims asserted in the complaint will be tried in the fall.

## THE FACTS

In determining the facts, I heard the testimony of thirteen witnesses and read the deposition testimony of three witnesses. On the material facts, I found Protas not to be a credible witness. I also found Michele Etienne not to be credible, including with respect to an anonymous note that she recalled having seen on a ledger page in 1973.

After observing the witnesses and evaluating their credibility and weighing all of the evidence, I make the following findings of fact.

Martha Graham was one of the leading dancers and choreographers of the twentieth century. Graham began dancing in the early 1920's and gave the first public performance of her own works in 1926. Graham formed an all-woman performance troupe under the name Martha Graham Group. Subsequently, men joined the troupe and its name was changed to the Martha Graham Dance Company. In the late 1920's and early 1930's, Graham began developing her own system of dance exercises and movements that focused on contracted muscles and energy release. After teaching her work informally and as an instructor at various institutions, Graham opened the Martha Graham School of Dance in approximately 1930.

In 1948, Graham and several of her supporters incorporated the Martha Graham Foundation for Contemporary Dance, Inc. under the New York Membership Corporation Law ("MCL"), the statutory predecessor of the current Not–For–Profit Cor-

poration Law. Pursuant to § 10 of the MCL, the Foundation's Certificate of Incorporation included a sworn statement by Graham that she "hereby consents to the use of her name in said corporate title." In 1968, the Foundation's name was changed to its current name, the Martha Graham Center of Contemporary Dance, Inc.

In 1956, on the advice of Rubin Gorewitz, her tax accountant, Graham incorporated the Martha Graham School of Contemporary Dance, Inc. under the MCL. The new institution was created to purchase the dance school that Graham had been operating as a sole proprietorship since 1930. As the proprietor of the school, Graham was subject to ordinary income tax on all income from the school. The sale of the school to defendant The Martha Graham School of Contemporary Dance enabled Graham to treat the purchase price, which was to be paid in ten annual installments, as long-term capital gain which was taxed at half the rate of ordinary income. In addition, it transferred all of the expenses of the school, including Social Security tax for its employees. There is clear and convincing evidence that Graham sold her school, including the perpetual right to use her name on the school, to the Martha Graham School of Contemporary Dance, Inc. for $50,000, payable over ten years. In addition, Graham entered into a ten-year employment agreement with the School. A number of Graham's tax returns from the late 1950's and early 1960's reflect payments to Graham that were reported as long term capital gain attributable to "Installment Sales Price Payment—Sale of School 1956."

Although the Martha Graham School and the Martha Graham Center ostensibly maintained separate boards and separate accounting books, membership on the two

boards was frequently identical; board meetings for the Boards were often held together; and funds from the Center were frequently used to help pay the expenses of the School. Additionally, the Center oversaw and funded the performances of the Martha Graham Dance Company, Graham's unincorporated performance troupe, and the Dance Company often used dancers from the School to participate in performances. Graham served as Artistic Director and Board member of both the Center and the School until her death in 1991.

Protas first became acquainted with Graham in approximately 1967, when after dropping out of law school, he was doing freelance photography. Although Protas was 26 years old and had no training in dance, he and Graham developed a very close friendship. By the mid–1970's, under Graham's auspices, Protas became executive director of the Center and a Board member of the Center and of the School, and was given the title of Co–Associate Artistic Director of the Center in approximately 1980.

Graham's last will, executed on January 19, 1989, named Protas sole executor and legatee and included the following provisions:

All personal and household effects, and other tangible personal property ... if owned by me at the time of my death, I give and bequeath to my said friend, Ron Protas, if he shall survive me.... The residue of ... all my property, real and personal, of every kind and description and wherever situated, including all property over which I may have power of appointment at the time of my death ... and including all property not otherwise effectively disposed of hereunder ... I give, devise and bequeath to my said friend, Ron Protas, if he shall survive me, or, if he shall not survive me, to the Martha Graham Center of Contemporary Dance, Inc.

In connection with any rights or interests in any dance works, musical scores, scenery sets, my personal papers and the use of my name, which may pass to my said friend Ron Protas ... I request, but do not enjoin, that he consult with my friends, Linda Hodes, Diane Gray, Halston, Ted Michaelson, Alex Racoli and Lee Traub, regarding the use of such rights or interests.

After Graham's death in 1991, Protas succeeded Graham as Artistic Director of the Center and School and was responsible for managing the daily activities of these two institutions. Although Protas had been advised by Peter Stern, the attorney he retained to represent him as executor of Graham's estate, to investigate what rights he actually had acquired under the will, and was given the same advice by Danskin, a manufacturer with which he sought to establish a business relationship, Protas made no such investigation. Nevertheless, he represented to his fellow directors at the Center and the School that he owned the exclusive right to use Martha Graham's name.

In 1993, Protas met with Ciro Gamboni, a partner of Cahill, Gordon and Reindel who had been representing the Center on a pro bono basis.[2] Protas and Gamboni discussed the possibility of obtaining trademark registrations for the name "Martha Graham" and for "Martha Graham technique." Gamboni suggested to Protas that the trademark applications be filed jointly in the name of both Protas and the Center. Gamboni assigned Michael Quinn, an associate in his firm's Washington, D.C. office, to assist with the trade-

**2.** Gamboni became a member of the Board of the Center in December 1993.

mark applications. Quinn informed Gamboni that a "joint ownership" of the marks was not feasible, but that Protas could assign to the Center an interest in the marks after the registrations were obtained. Gamboni agreed to help Protas file trademark applications with the understanding that the purpose of the applications was to benefit the Center and that the Center would receive a 40% interest in any proceeds generated by licensing the trademarks to third parties.

In November 1993, Quinn, with the assistance of another associate, Scott Martin, filed applications with the United States Patent and Trademark Office ("PTO") on Protas' behalf for registration of the two service marks on which Protas now sues: a) MARTHA GRAHAM; and b) MARTHA GRAHAM TECHNIQUE. The applications, which were signed by Protas subject to the penalty of perjury, stated that Protas owned these marks, that the marks had first been used in commerce in 1926, and that they were used by the Center and School pursuant to an oral license from Graham. The only evidence submitted to the Trademark Office of continuous use of the trademarks consisted of recent Center and School brochures. In drafting the applications and responses to PTO office actions which requested additional information about the alleged oral license from Graham to the defendants, Quinn and Martin relied on unsupported assertions made by Protas and Barbara Groves, a senior administrative employee at the Center who reported to Protas.

On August 15, 1995, the PTO granted federal registration for MARTHA GRAHAM TECHNIQUE in connection with "educational services; namely providing instruction through classes and workshops in the field of contemporary dance." On October 10, 1995, federal registration was granted for use of the name MARTHA

GRAHAM in connection with "educational services; namely providing instruction through classes and workshops in the field of contemporary dance, and entertainment services; namely, organizing and producing performances of contemporary dance." No affidavit of continuous use has been filed with regard to these marks pursuant to 15 U.S.C. § 1065. Accordingly, the marks are not incontestable.

Between 1995 and 1998, the Center and the School continued to operate under the names by which they had been incorporated in 1948 and 1956 respectively and continued to describe the method of dance that they taught as the "Martha Graham technique."

In 1998, Protas, with assistance from Quinn, created the Martha Graham Trust, a revocable trust, which named Protas as its sole trustee and beneficiary. The trust was created to serve as a repository to hold and license all of the Martha Graham intellectual property that Protas claimed he had inherited. After a strained relationship with Protas and increased difficulty with fund-raising, in 1998, the Boards of the Center and the School began discussions with Protas to diminish Protas' role at the Center and School and to replace Protas as Artistic Director. In furtherance of this effort, the Boards entered into negotiations with Protas for a license agreement to use the Graham trademarks.

Initially, Protas was represented in these negotiations by Howell E. Begle of the law firm of Verner, Liipfert, Bernhard, McPherson & Hand. Begle was replaced by another attorney, Egon Dumler. Protas eventually replaced Dumler with Quinn, who was no longer employed by Cahill, Gordon and Reindel. Todd Dellinger, the Managing Director of the Center and the School, handled the initial negotiations and drafting of the license agreement on behalf of the Center and the

School. Dellinger is not an attorney, was hired by Protas, and reported to Protas as his supervisor. Moreover, Protas had asked Dellinger to become the director of his Martha Graham Trust. Dellinger, the initial drafter, remained the custodian and recorder of all drafts.

Robert Solomon, a Board member and a tax partner at the law firm of Frankfurt, Garbus, Kurnit, Klein & Selz, as well as William Prescott, the financial advisor to Dolores Weaver, one of the members of the Board,[3] participated in reviewing the terms of the license agreement on behalf of the Center and the School. Neither before nor during the negotiations for the license agreement did any of defendants' lawyers or directors investigate the validity, or true ownership, of the Graham trademarks.

A written license agreement between the Center and the School and the Martha Graham Trust was executed on July 15, 1999. The agreement contains the following provision granting a license to the Center to use the trademarks:

> The Trust grants to the Center a non-exclusive license to the Martha Graham name and to certain Martha Graham marks as identified on the trademark schedule attached hereto (said name and marks collectively referred to herein as "MG Marks") . . . The Center may not use the MG Marks other than as specified herein, and the Trust as licensor shall be the sole judge of whether any particular product or service bearing or offered under any MG Mark is within the scope of the license granted hereunder. The use of all MG Marks under this license shall inure solely to the benefit of the Trust and shall not vest the

Center with any title or right to the MG Marks or any presumptive right to use such marks except as expressly permitted under this agreement and, then, only while this license agreement is in effect. The Center shall not claim any title or other right to use any Martha Graham mark except as expressly licensed by this agreement, nor will it contest the validity of any right held by the Trust in the Martha Graham marks and any registration therefore.

In addition to a $1 annual licensing fee, the agreement provides for Protas to receive a salary (starting at $55,000 in the first year and increasing to $76,000 in the tenth year) and full health and dental benefits. Additionally, the agreement requires defendants to provide a variety of benefits to an "Artistic Consultant," appointed by the Martha Graham Trust, of which Protas was the sole trustee and beneficiary. These benefits include: (i) membership on the Board; (ii) a furnished office "that is similar in size and appointment to that which was previously afforded Ronald Protas in the Center's former building"; (iii) an executive assistant; (iv) a consulting fee (starting at $40,000 in the first year and rising to $49,000 in the tenth year); (v) a travel allowance of up to $4,000 per event, up to a maximum of $20,000 per year; and (vi) tickets to the dance company's performances.

Although the agreement did not specifically provide for Protas to step down as Artistic Director, the principal motive for the consent of the Center and the School to the license agreement was their desire to obtain Protas' agreement to step down as Artistic Director. The Board understood that several potential donors would not

---

**3.** Weaver asked Prescott to review the license agreement because Weaver had made a pledge to give the Center a $250,000 grant from the Weaver Family Foundation that was contingent on the Center achieving an agreement with Protas that would result in his relinquishing his position.

fund defendants' activities as long as Protas was their Artistic Director. Prior to the execution of the license agreement, Protas had indicated that he would be willing to accept the appointment of Janet Eilber to replace him as Artistic Director. However, because of the continuing financial difficulties of the Center and the School, Eilber was unable to accept the position of Artistic Director. At a meeting of the Boards on February 24, 2000, Protas expressed concerns about Eilber's withdrawal and proposed that he stay on as Artistic Director. At the following Board meeting, on March 23, 2000, the Board approved a motion to remove Protas as Artistic Director. In light of continued financial problems, including the Center's inability to pay its rent and payroll, the Center's Board voted to suspend operations on May 25, 2000.

The license agreement permitted the Martha Graham Trust to terminate the license agreement should any of a number of conditions not be satisfied. One of these conditions required that the Center and the School have "continuing operations," which was defined in the agreement, as follows: "For the Center and School to be considered operational, the combined expense budget must not fall below one million dollars." On May 25, 2000, Protas sent a letter to Francis Mason, the Acting Chairman of the Board of the Center, in which he stated that "the Martha Graham Trust (the 'Trust'), as licensor, invokes its rights under the Agreement entered into between the Trust and the Center to terminate the Agreement effective 12:01 AM EDT on May 26, 2000."

On June 22, 2000, the Board voted to remove Protas from the Board of Directors. Following Protas' removal, Protas, acting through the Martha Graham Trust, founded the Martha Graham School and Dance Foundation ("Foundation"), a not-for-profit corporation organized under Delaware law. The Martha Graham Trust then granted exclusive licenses to Protas' Foundation to establish a school and to license performances of Martha Graham's ballets. Following Protas' departure, the Center and the School received a significant amount of funding. Moreover, the Center and the School obtained a long-term lease to their former premises and a grant for the renovation of the Center's and the School's premises. In December 2000, the Center announced that the School would reopen in January 2001. The School reopened on January 16, 2001.

## DISCUSSION

### Licensee Estoppel

It is undisputed that Protas registered as service marks "Martha Graham" and "Martha Graham technique" for educational services. It is also undisputed that defendants have used "Martha Graham" in their corporate names since their incorporation in 1948 and 1956, and have used the term "Martha Graham technique" in various educational contexts. Plaintiffs assert that defendants' use of these registered marks constitutes trademark infringement pursuant to 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a), common law unfair competition and dilution pursuant to 15 U.S.C. § 1125(c) and N.Y. General Business Law § 368-1 (formerly § 368-d). Plaintiffs invoke the doctrine of licensee estoppel and contend that the existence of the 1999 license agreement effectively prevents defendants from contesting the validity of the marks that were registered by Protas, and thus precludes defendants from asserting their right to continue to use the names under which they were incorporated and have operated and the term that they have used to describe the method of dance that they teach.

Under the doctrine of licensee estoppel, "a licensee who has used a designation under a license from another is ordinarily estopped from asserting ownership of the designation as against the licensor." *Restatement (Third) Unfair Competition,* § 33, comment d. *See, e.g., Seven–Up Bottling Co. v. Seven–Up Co.,* 561 F.2d 1275, 1279 (8th Cir.1977); *E.G.L. Gem Lab Ltd. v. Gem Quality Institute, Inc.,* 90 F.Supp.2d 277, 291–92 (S.D.N.Y. 2000); *New York Trust Co. v. Believe It or Not, Inc.,* 12 Misc.2d 736, 178 N.Y.S.2d 12, 16 (1958). However, the doctrine of licensee estoppel is "equitable in nature" and is "not subject to rigid application." *Westco Group, Inc. v. K.B. & Assocs., Inc.,* 128 F.Supp.2d 1082, 1090 (N.D.Ohio 2001). *See also Restatement (Third) Unfair Competition,* § 33, comment d ("licensee estoppel is an equitable doctrine, and a court remains free to consider the particular circumstances of the case, including the nature of the licensee's claim and the terms of the license.").

Although the facts giving rise to the defenses asserted in this case did not arise after the license from Protas had expired, and could have been discovered had the Boards of the Center and the School acted diligently at any time prior to the execution of the license agreement, it is inequitable to apply the doctrine of licensee estoppel in this case. The means by which Protas procured the trademark registrations, the terms of the short-lived license agreement and the context in which it was executed, as well as the relationship between the parties and the public interest in charitable and educational corporations all argue against the application of the doctrine of licensee estoppel by a court of equity.

Protas provided erroneous and misleading material information to the PTO in prosecuting the trademark applications.

The trademark applications misled the PTO concerning the relationship between Graham and the Center and the School. Each of the trademark applications contained the following language:

use of the mark was licensed to the Martha Graham Center of Contemporary Dance Inc. by Martha Graham during her lifetime, and Applicant is now the licensor of that license by devise. The Center operates the Martha Graham School of Contemporary Dance that is identified on the specimens.

In response to Office Actions posed by the PTO inquiring about the nature of the alleged license from Graham to the Center, Scott Martin, one of the attorneys at Cahill, Gordon and Reindel, asserted on behalf of Protas, that "the mark ... is used by the Martha Graham Center ... by permission of Applicant, namely by oral license, for use in connection with all those services listed in this Application." However, there is no credible evidence supporting the representation that the Center and the School used these marks pursuant to an oral license from Graham during her life. None of the financial records in evidence reflects any payment to Graham for the use of her name in the title of the institutions or for the use of her name in describing the method of dance taught at the institutions. Similarly, none of Graham's tax returns in evidence reflects any royalty payment to Graham for the use of her name.

A document was proffered by plaintiffs that purports to be an agreement dated September 15, 1988, granting permission to use certain properties belonging to Martha Graham, including "name," for a period of one year for the payment of a designated royalty. This document which is not signed on behalf of defendants has no indicia of reliability. For the first 40 years of defendants' existence, there is no similar

document. While plaintiffs argue that this document "memorializes" the existence of a license from Graham over the prior 40 years, nothing in the document corroborates that theory. Additionally, this unexecuted purported agreement was mysteriously placed in the file of defendants when Graham was 94 years old. Michele Etienne, who, as the business manager of the Center, maintained the Center's accounting records at the time, never saw the document during her time at the Center. Moreover, since it is not signed on behalf of defendants, it has no legal effect. This mysterious document, when coupled with evidence of the existence of numerous blank pieces of Center stationery containing Graham's signature at the bottom, is entitled to no weight.

In fact, in 1948, Graham granted the Center (then called the Martha Graham Foundation for Contemporary Dance, Inc.) the right to use her name in its corporate title. There is no credible evidence that that right was revocable or limited to Martha Graham's lifetime. In addition, in 1956, Graham sold her Martha Graham School of Dance, including its name and attendant good-will, to the Martha Graham School. Thus, at the time Protas registered the service marks, the Center and the School did not use the name Martha Graham pursuant to some oral license from Graham or Protas, rather the Center and the School owned the irrevocable right to use the name in connection with the educational services that they provide. Moreover, Graham's will shows that Graham recognized that she did not own all rights to her name. The will refers to "any rights or interests ... which may pass to my said friend Ron Protas." Accordingly, the registration of the names that were the subject of the license agreement, was procured by the presentation of inaccurate and misleading information to the PTO whether intentionally or not.

Additionally, Protas registered the marks in his own name when he was a member of the Boards of the Center and the School although he knew that Graham had expected the Center and the School to continue after her death. Graham's will names the Center as her contingent heir. Similarly, Graham's cremation instructions provide that "in lieu of any funeral or memorial service, contributions be made to the Martha Graham Center of Contemporary Dance, Inc. to support that which has played such a rich and meaningful part in my life."

On September 14, 1990, less than a year before Graham's death, Protas wrote a letter in behalf of Graham, to Jim McGarry concerning a potentially negative article that was to be written by Laura Shapiro of Newsweek. Protas expressed Graham's concern that Shapiro would be writing a "hit piece" concerning the future of the Martha Graham Company. Protas wrote that "Martha wants to say: 'So deeply concerned am I for the future of my work and that the Martha Graham Center goes on that I have ensured through my attorney that the technique and the ballets will continue to be available and used by the Martha Graham Company and School.'" Accordingly, Protas knew that Graham intended and expected that the Center and the School would continue to use her name after her death. If by registering Martha Graham's name in connection with educational services, Protas sought the ability to preclude the Center and the School from using Martha Graham's name, he was seeking to undermine the arrangements of Martha Graham with respect to the use of her name.

Moreover, because of his position as a director and major employee of defendants, Protas had a fiduciary duty of undivided loyalty to the Center and the School.

*Aramony v. United Way of America,* 1998 WL 205331, at *7 (S.D.N.Y. April 27, 1998) ("As chief executive officer of UWA, Aramony owed the organization and its members a fiduciary duty of undivided loyalty."); *Scheuer Family Foundation, Inc. v. 61 Associates,* 179 A.D.2d 65, 582 N.Y.S.2d 662, 664 (1st Dep't 1992) ("it is well established that, as fiduciaries, board members bear a duty of loyalty to the corporation and may not profit improperly at the expense of the corporation.") (internal citations omitted). The registration of these marks for a purpose adverse to the entities to which Protas owed that duty was contrary to his fiduciary obligations.

Protas also used defendants' pro bono counsel, Cahill, Gordon and Reindel, to register the marks in his own name. Ciro Gamboni, the partner at Cahill who supervised the trademark work, testified that the firm assisted Protas based on the understanding that the registration would benefit the Center and the School. In fact, Protas did not pay attorneys' fees for the services provided by Cahill in association with the trademark applications, further demonstrating that it was the understanding of the parties at the time of the trademark registration that the trademarks were to be used to benefit the Center and the School. It is inequitable to permit Protas to now use these trademarks, which had been registered to help the Center and the School, as a basis for preventing their continued use of the names under which they were incorporated and have used to describe what they teach.

Furthermore, the overwhelming number of cases applying the doctrine of licensee estoppel have involved licenses that were in place for a substantial period of time. *See, e.g., Seven–Up Bottling Co. v. Seven–Up. Co.,* 561 F.2d 1275 (8th Cir.1977) (35 years); *Professional Golfers Ass'n of America v. Bankers Life & Casualty Co.,* 514 F.2d 665 (5th Cir.1975) (9 years); *Smith v. Dental Products Co.,* 140 F.2d 140 (7th Cir.1944) (17 years); *E.G.L. Gem Lab, Ltd. v. Gem Quality Institute, Inc.,* 90 F.Supp.2d 277 (S.D.N.Y.2000) (9 years); *Bandag, Inc. v. Lewis General Tires, Inc.,* 1980 WL 30328 (W.D.N.Y. Mar. 24, 1980) (12 years); *Distillerie Flli Ramazzotti, SPA v. Banfi Products Corp.,* 52 Misc.2d 593, 276 N.Y.S.2d 413 (1966) (42 years); *New York Trust Co. v. Believe It Or Not, Inc.,* 12 Misc.2d 736, 178 N.Y.S.2d 12 (1958) (5 years). The parties executed the short-lived license agreement on July 15, 1999. On May 25, 2000, Protas sent a letter terminating the license agreement "effective 12:01 AM EDT on May 26, 2000." Licensee estoppel is more persuasive in those instances in which the licensee had implicitly acknowledged the validity of the trademarks over an extended licensing relationship. In the present case, defendants' status as a licensee lasted for barely 10 months.

Finally, the vast majority of decisions that have applied licensee estoppel have involved estopping commercial licensees. *See, e.g., Seven–Up Bottling Co. v. Seven–Up. Co.,* 561 F.2d 1275 (8th Cir.1977); *Smith v. Dental Products Co.,* 140 F.2d 140 (7th Cir.1944); *E.G.L. Gem Lab, Ltd. v. Gem Quality Institute, Inc.,* 90 F.Supp.2d 277 (S.D.N.Y.2000); *Distillerie Flli Ramazzotti, SPA v. Banfi Products Corp.,* 52 Misc.2d 593, 276 N.Y.S.2d 413 (1966); *New York Trust Co. v. Believe It or Not, Inc.,* 12 Misc.2d 736, 178 N.Y.S.2d 12 (1958). In weighing the equities, the status of the licensee and the nature of plaintiffs' claims are important factors. In this case, the Center and the School are not-for-profit educational institutions which contribute to the advancement of the art of dance and Martha Graham's legacy. Plaintiffs seek to prevent those institutions from using the names by which

they have been known to the public for almost 50 years and to prevent those institutions from using a term that they have used to describe what they teach for almost 50 years.

For the foregoing reasons, a court of equity should not apply the doctrine of licensee estoppel in this case.

**No–Contest Provision in License Agreement**

■ Plaintiffs argue that even if defendants are not barred by the doctrine of licensee estoppel, a provision in the license agreement precludes defendants from contesting the validity of plaintiffs' trademarks. The agreement includes the following language:

> The Center shall not claim any title or other right to use any Martha Graham mark except as expressly licensed by this agreement, nor will it contest the validity of any right held by the Trust in the Martha Graham marks and any registration therefore.

I construe this provision as restricting defendants only during the duration of the license agreement. This promise to forebear from contesting the marks is included within a clause that clearly involves the obligations of the parties during the existence of the agreement. For example, the sentence immediately preceding the "no-contest" provision states that "The use of all MG Marks under this license shall inure solely to the benefit of the Trust and shall not vest the Center with any title or right to the MG Marks or any presumptive right to use such marks except as expressly permitted under this agreement and, then, *only while this license agreement is in effect."* (emphasis added). Similarly, the sentence immediately following the "no-contest" provision clearly involves restrictions applicable only during the duration of the license agreement. Once the Martha Graham Trust terminated the li-

cense agreement, it cannot continue to seek to enforce a provision that does not survive the agreement.

Moreover, after a contract has been materially breached, the non-breaching party may either continue to perform under the contract and thereby retain the benefits and obligations of the contract and sue for partial breach, or declare the contract terminated, perform no further and sue for total breach. *See Ryan v. Volpone Stamp,* 107 F.Supp.2d 369, 386 (S.D.N.Y.2000) ("Under no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits."). In the present case, the Martha Graham Trust determined that certain actions by defendants, including the Boards' decision to cease operations for financial reasons, constituted a breach of contract. On May 25, 2000, when the Trust invoked its right under the license agreement to terminate the agreement, it relinquished its right to enjoy, or seek to enforce, the benefits of that agreement.

**Assignment Provision in License Agreement**

■ Plaintiffs argue that an assignment provision in the license agreement prevents defendants from contending that plaintiffs do not own the trademarks. The agreement includes the following provision:

> To the extent that any rights to any MG Mark or MG Work is deemed hereafter to accrue to the Center, the School, Company or Ensemble, the Center assigns any or all such rights at such time they may be deemed to accrue, including the goodwill associated therewith, to the Trust.

Plaintiffs argue that defendants cannot contend that they are entitled to use the name Martha Graham because they have assigned all rights to the name to the

Martha Graham Trust. However, plaintiffs' argument fails. Defendants do not assert, nor is there any evidence, that defendants acquired rights in the marks subsequent to the license agreement. Rather, defendants argue that the Center and the School acquired the rights to use the name "Martha Graham" in 1948 and 1956, respectively. The license agreement was not executed until 1999. Since there is no contention that rights have "hereafter accrued," the assignment provision does not assist plaintiffs in this case.

### Merger Clause

■ Plaintiffs also argue that the "merger clause" in the license agreement precludes defendants from asserting that Graham had made an agreement with the Center and the School with respect to the use of her name in 1948 and 1956, respectively. The license agreement provides:

> This agreement and all addenda attached contain the entire understanding between the parties hereto and supersede prior written or oral agreement respecting the within subject matter. There are no representations, agreements, arrangements or understandings, oral or written, between the parties hereto relating to the subject matter of this agreement which are not fully expressed herein.

Plaintiffs contend that this provision supersedes any earlier agreement permitting defendants to use the name "Martha Graham." Plaintiffs' argument fails for a number of reasons. First, defendants do not argue that they are entitled to use the name "Martha Graham" under a prior agreement between *"the parties"* to the license agreement. Defendants have proven that they had a prior agreement with Graham, not with the Martha Graham Trust or with Protas. Plaintiffs' argument extending the merger clause to agreements between defendants and Graham,

who was not a party to the license agreement, misconstrues the language of the clause; Protas is not Martha Graham. Similarly, plaintiffs have proffered no evidence to support their contention that the merger clause was designed to supplant agreements that were entered into approximately 50 years before the license agreement was executed.

### Defenses to Trademark Infringement

#### Fraud

■ Defendants do not dispute that if the trademarks at issue are valid and owned by plaintiffs, they were infringed. However, defendants do raise a number of defenses to trademark infringement. In addition to raising defenses that are specific to each trademark, defendants contend that both trademarks were obtained by fraud. A trademark registration is invalid if it was fraudulently obtained. 15 U.S.C. § 1115(b)(1). "Allegedly fraudulent statements must show a deliberate attempt to mislead the Patent and Trademark Office and may not be the product of mere error or inadvertence." *Pilates, Inc. v. Current Concepts, Inc.*, 120 F.Supp.2d 286, 312 (S.D.N.Y.2000). Moreover, a fraud defense must be proven by clear and convincing evidence. *See Orient Express Trading Co. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir.1988); *Pilates*, 120 F.Supp.2d at 295. Defendants argue that a variety of statements made in the trademark applications were fraudulent. Although each of these statements were clearly and convincingly proven to be false, plaintiffs failed to prove by clear and convincing evidence that Protas knowingly made the statements to mislead the PTO.

The "Martha Graham" application included the material misstatement that Martha Graham had orally licensed the use of her name to the Center and the School during her lifetime and that Protas

inherited these licenses from Graham at the time of her death. Although there is no credible evidence to support the claim that Graham had licensed her name to the Center and the School, and there is clear and convincing evidence that the Center and the School were owners, not licensees, of the right to use the name Martha Graham in connection with their activities at the time of Graham's death, defendants have not proven that Protas knew the historic facts at the time of the trademark applications. Protas' trademark counsel, Scott Martin, testified that he consulted with both Protas and Barbara Groves, a senior administrative employee at the Center, before providing the information in the trademark applications. Martin did not remember whether the alleged license information originated from Protas or from Groves.

There is no evidence that either Protas or Groves had any actual knowledge of the early relationship between Martha Graham and defendants, and it is clear that neither Protas nor his counsel sought to examine the records that show the early history of the defendants. Since the representations were based on unsupported and unsupportable assumptions, and not on facts known to the applicant, they were misrepresentations of the applicant's knowledge. However, although the applicant was foolish, and perhaps reckless, there is not clear and convincing evidence that he knew and concealed the truth and intended to mislead the PTO. Since that is the proof required for a claim of fraud pursuant to 15 U.S.C. § 1115(b)(1), the evidence is not weighty enough to establish fraud on the PTO.

### Prior Use

■ Defendants argue that they are prior users of the name Martha Graham in connection with their respective educational institutions. In order to assert a prior use defense, "defendants must prove four elements: (1) present rights in the mark; (2) acquired prior to the date of registration; (3) continual use of the mark since that date; and (4) use prior to the registrant on the goods or services that are in issue." *Pilates*, 120 F.Supp.2d at 311.

### Martha Graham Center of Contemporary Dance, Inc.

■ In 1948, Graham and several of her supporters established a not-for-profit institution, the Martha Graham Foundation for Contemporary Dance, Inc. The Foundation was created to support modern dance by promoting and disseminating the Martha Graham technique, as well as raising funds for performances of the Martha Graham Dance Company. The Foundation was incorporated under the Membership Corporation Law ("MCL"), the statutory predecessor of the current Not–For–Profit Corporation Law. Graham was not one of the six individuals who executed the Certificate of Incorporation. Graham also was not listed as one of the original three directors of the Foundation. However, in accordance with § 10 of the MCL, the Foundation's certificate of incorporation included a sworn statement by Graham acknowledging that she "hereby consents to the use of her name in such corporate title." In 1968, the Foundation's name was changed to its current name, the Martha Graham Center of Contemporary Dance, Inc.

Plaintiffs' argue that Graham's consent accompanying the Certificate of Incorporation was a limited license from Graham to the Center permitting the use of her name, and that Graham, as licensor, retained the right to revoke the Center's use of her name. Plaintiffs further contend that Protas, pursuant to the provisions of Graham's will, inherited the ability to step into Graham's shoes and revoke her con-

sent. Plaintiffs' argument is unconvincing. Graham's consent to use her name in 1948 was not a license from Graham to the Center, but rather was an assignment to the Center. This assignment benefitted Graham. The Center was created to raise money to promote the Martha Graham technique and to fund the performances of the Martha Graham Dance Company. Graham's supporters could make tax-deductible donations to the Center. There is no credible evidence that Graham was paid a licensing fee for the use of her name during her life. Additionally, not only is there no credible evidence that Graham intended to retain the ability to revoke the name of the Center or any evidence that Graham believed that she could remove her name, the evidence shows that Graham understood her consent to be an irrevocable assignment to the Center.

By virtue of this assignment, the Center became the senior user of the mark.

**Martha Graham School of Contemporary Dance, Inc.**

■ Defendants have also proven by clear and convincing evidence that in 1956, Graham sold the Martha Graham School of Dance, a sole proprietorship that Graham had been operating since approximately 1930, to defendant Martha Graham School of Contemporary Dance, Inc., a not-for-profit entity incorporated for the purpose of purchasing the school from Graham. Rubin Gorewitz, Graham's accountant and the School's accountant in its early days, testified very credibly that he advised Graham to sell her going concern, Martha Graham School of Dance, including its name, goodwill, assets and operations, to a newly created not-for-profit entity. Specifically, Gorewitz advised Graham to form this new not-for-profit entity because it would allow Graham to stop paying Social Security taxes for her employees, and contributions to the School would be tax-de-

ductible. The sale of her school for a price to be paid in ten installments allowed Graham to treat payments from the newly-formed school as the proceeds of the sale of the school. Thus, her income from the school was transformed into capital gains taxable at one-half the rate of ordinary income. Gorewitz helped structure the sale and prepared the Form 1023 Exemption Application for the School. He also testified that Graham proceeded with the sale. A number of Graham's tax returns from the late 1950's and early 1960's, as well as minutes from a number of Board meetings in the 1960's, confirm Gorewitz's testimony that Graham did sell her School and received the purchase price in installments.

Gorewitz's testimony was further corroborated by a "Protest" transmitted from the Commissioner of Internal Revenue to Louis Goodkind, Philip Zimet and Bernard Bressler, identified on the Protest as the "Attorneys for the Martha Graham School of Contemporary Dance, Inc." The Protest noted that the School:

> purchased, on December 1, 1956, the existing school of dance which Miss Martha Graham had been carrying on for many years as a sole proprietorship.... For the purchase of the school as a going concern, the corporation agreed to pay to Miss Graham a total of $50,000 to be paid in installments over a period of ten years, and Miss Graham agreed not to permit the use of her name professionally or commercially in the name of any other school or institution of learning....

> ·     ·     ·     ·     ·

> The directors of the School corporation are essentially interested in the Martha Graham Technique, and they desire to make instruction in that technique more widely available on a sound and enduring academic basis. Had they been mo-

tivated, however, by materialistic rather than cultural considerations ... they could have done nothing more vital to attract attention to the School and to assure the success of its program than to acquire permanent and exclusive academic use of her name and to engage her personal services as a teacher and lecturer and a supervisor of the educational program of the School. The School was fortunate in being able to do both of these things....

.    .    .    .    .

the $50,000 in total compensation which the School corporation has agreed to pay in installments over a period of ten years for her School as a going concern and for the exclusive right to use her name in the name of the School....

Accordingly, there is clear and convincing evidence that the School purchased the Martha Graham School of Dance, including, specifically, the right to keep the name Martha Graham in the name of the School. Plaintiffs cannot now preclude the School's use of a name that the School bought, used and owned for 39 years prior to Protas' registration of the trademark. *See, e.g., White v. William G. White,* 160 A.D. 709, 145 N.Y.S. 743 (1st Dep't 1914) (White established a sole proprietorship which he later incorporated as "William G. White, Inc." White then "assigned and transferred to the corporation all his right, title and interest in and to the business which he had theretofore conducted, including the stock on hand and good will, and received therefor ... capital stock ... of the corporation." After selling his stock, the court refused to allow White to revoke the use of his name by the corporation, because "by his own voluntary act he has given the defendant [corporation] his name and the right to use it."). *See also Levitt Corp. v. William J. Levitt et al.,* 593 F.2d 463 (2d Cir.1979) (barring William Levitt, builder of renowned Levittowns who had sold his business for valuable consideration, from subsequently using or advertising his own name in a competing business); *Charles S. Higgins Co. v. Higgins Soap Co.,* 144 N.Y. 462, 39 N.E. 490 (N.Y.1895) (Charles Higgins sold established soap proprietorship, including goodwill and trademarks, to "Charles S. Higgins Company." The Court of Appeals precluded Higgins from subsequently using his name in a second competing company because it would tend "to create confusion and to enable the later corporation to obtain, by reason of the similarity of names, the business of the prior one.").

**Martha Graham Technique**

█ The trademark "Martha Graham technique" does not exist in a vacuum. Rather, the term "technique" is distinctive only when combined with the name "Martha Graham." Therefore, the service mark registration issued by the PTO for "Martha Graham technique" provides that "no claim is made to the exclusive right to use 'Technique,' apart from the mark as shown." Since there is clear and convincing evidence entitling defendants to use the name "Martha Graham" in connection with their respective educational institutions, plaintiffs are not entitled to an injunction to prevent defendants from using the word "technique" in conjunction with the name "Martha Graham."

**CONCLUSION**

For the foregoing reasons, plaintiffs are not entitled to injunctive relief, and the Clerk of the Court shall enter judgment for defendants on Claims One, Two, Three and Four. With respect to any remedy other than denial of injunctive relief, a separate hearing will be held on September 14, 2001 at 10 A.M.

The foregoing shall constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

SO ORDERED.