MARTHA GRAHAM SCHOOL AND DANCE FOUNDATION, INC. and Ronald Protas, Individually and as Trustee of the Martha Graham Trust, Plaintiffs–Appellants,

v.

MARTHA GRAHAM CENTER OF CONTEMPORARY DANCE, INC. and Martha Graham School of Contemporary Dance, Inc., Defendants–Appellee,

Eliot L. SPITZER, Attorney General of the State of New York, Intervenor–Defendant–Appellee.

Docket No. 01–9055.

United States Court of Appeals, Second Circuit.

July 2, 2002.

Judd Burstein (Sanjit Shah, of counsel), Judd Burstein, P.C., New York, NY, for Plaintiffs–Appellants.

Katherine B. Forrest (Robert D. Joffe, Joanne M. Gentile, of counsel), Cravath, Swaine & Moore, New York, NY, for Defendants–Appellees.

Marla G. Simpson, Assistant Attorney General, Charities Bureau (Michael Belohlavek, Deputy Solicitor General, Dietrich Snell, Deputy Attorney General, Division of Public Advocacy, William Josephson, Assistant Attorney General–in–Charge, Charities Bureau, of counsel), for Eliot Spitzer, Attorney General of the State of New York, on the brief, New York, NY, for Intervenor–Defendant–Appellee.

Present MINER, CABRANES and POOLER, Circuit Judges.

## SUMMARY ORDER

Appeal from a judgment of the United States District Court for the Southern District of New York (Miriam Goldman Cedarbaum, *Judge* ).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of said District Court be and hereby is AFFIRMED.

The plaintiffs brought the instant lawsuit against the defendants for, *inter alia,* trademark infringement. The plaintiffs now appeal from a judgment in favor of defendants-appellees after bench trial. For the reasons below, we affirm the judgment of the District Court.

### BACKGROUND

One of the most renowned dancers and choreographers of her era, Martha Graham began performing in the 1920s. *Martha Graham Sch. and Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.,* 153 F.Supp.2d 512, 515 (S.D.N.Y.2001). After performing and teaching for several years, Graham founded the Martha Graham School of Dance around 1930. *Id.*

In 1948, Graham helped establish the Martha Graham Foundation for Contemporary Dance, Inc. *Id.* Included with the Foundation's Certificate of Incorporation was Graham's sworn statement that she

"hereby consents to the use of her name in said corporate title." *Id.* The Foundation was later renamed the Martha Graham Center of Contemporary Dance, Inc. (the "Center"). *Id.*

In 1956, Graham founded the Martha Graham School of Contemporary Dance, Inc. (the "School") to buy the sole proprietorship dance school that she had operated since 1930. *Id.* In exchange for $50,000, Graham sold her school, and the "perpetual right to use her name on the school." *Id.* Graham also entered into a ten-year employment agreement with the School. *Id.*

In 1967, Ronald Protas first met Martha Graham. *Id.* at 516. With Graham's help, Protas soon had positions in the School and Center. By the 1970s, Protas became executive director of the Center and a Board member of the Center and of the School. *Id.* By around 1980, Protas became CoAssociate Artistic Director of the Center. *Id.* In 1991, after Graham died, Protas became Artistic Director of the Center and School. *Id.*

In her will, Graham bequeathed to Protas all her property "not otherwise effectively disposed of." *Id.* The will also named Protas executor. *Id.* In connection with his role as executor, Graham retained an attorney who recommended that Protas determine what rights he had actually inherited under the will. *Id.* Protas did not heed this advice. *Id.* Nevertheless, the District Court found that "[Protas] represented to his fellow directors at the Center and the School that he owned the exclusive right to use Martha Graham's name." *Id.*

In 1993, Protas sought to have the Center's attorneys file trademark applications in the name of "Martha Graham" and "Martha Graham Technique" (collectively the "MG marks") on his behalf, "with the understanding that the purpose of the applications was to benefit the Center and that the Center would receive a 40% interest in any proceeds generated by licensing the trademarks to third parties." *Martha Graham Sch.,* 153 F.Supp.2d at 516–17.

In November 1993, lawyers filed applications to register the MG marks with the United States Patent and Trademark Office ("PTO") on Protas' behalf. *Id.* In the application, Protas stated, *inter alia,* that he was the licensor of the marks by devise, that the marks were first used in commerce as early as 1926, and that the Center and School were using the marks pursuant to a license from Graham.[1] *Id.* at 517. In August and October of 1995, the PTO granted federal registrations to Protas (individually) for the MG marks. *Id.*

In 1998, Protas established the Martha Graham Trust (the "Trust") to hold and license the intellectual property that Protas purportedly had received in Graham's will. *Id.* Protas was the sole trustee and beneficiary of the Trust. *Id.* In 1998, the Boards of the Center and the School initiated negotiations with the Trust to license the MG marks. *Id.* None of the defendants' lawyers or directors investigated whether Protas actually owned or validly registered the MG marks. *Id.* at 518.

On July 15, 1999, a written license agreement (the "Agreement") was entered into between the Center and the School and the Trust. *Id.* The Agreement granted the Center and School a non-exclusive license to the Martha Graham name and to certain Martha Graham marks. *Id.* It also provided, among other things, that "[t]he Center shall not claim any title or other right to use any Martha Graham mark except as expressly licensed by this agreement, nor will it contest the validity of any right held by the Trust in the Martha

---

1. Protas testified at trial that this license was granted orally.

Graham marks and any registration therefore." *Id.* In return for the rights to use the MG marks, the School and Center were required to pay a $1 annual licensing fee and a salary and benefits for Protas. *Id.* In addition, the contract required that they provide benefits for an "Artistic Consultant" appointed by the Trust. *Id.*

On March 23, 2000, the Board of the Center voted to remove Protas as Artistic Director. *Id.* at 519. The Center's Board also voted to suspend operations on May 25, 2000, because the Center was facing severe funding problems. *Id.* Pursuant to the Agreement—which permitted the Trust to terminate the license if the Center suspended operations—Protas sent a letter to the Center terminating their Agreement effective May 26, 2000. *Id.*

The Board voted Protas off the Board of Directors on June 22, 2000. After the vote, Protas acted through the Trust to establish the Martha Graham School and Dance Foundation (the "Foundation") and had the Trust grant the Foundation exclusive licenses to establish a school and to license Graham's ballet performances. *Id.* After an infusion of funding, the School reopened on January 16, 2001. *Id.* As before, the School used Graham's name in its title.

On January 12, 2001, Protas filed the instant lawsuit against the Center and School claiming, among other things, trademark infringement. He moved for a temporary restraining order barring the Center and School from using the trademarks "Martha Graham" and "Martha Graham Technique." After Protas commenced this action, the Attorney General of the State of New York intervened as a party defendant, acting on behalf of the unnamed charitable beneficiaries of the Center and the School.

The District Court consolidated the trial on the merits and the permanent injunction hearing on trademark issues. After a bench trial, the District Court denied Protas' motion for injunctive relief, entering judgment for the Center and School on August 10, 2001. Protas filed a timely appeal on September 7, 2001.

On appeal, the plaintiffs principally argue that: (1) Protas inherited the rights to Graham's name from Graham's will; (2) the defendants are estopped from asserting ownership rights over the Graham trademarks because of licensee estoppel; and (3) the express terms of the Agreement preclude the defendants from asserting ownership over Graham's name. The District Court rejected these arguments, concluding that the defendants owned the relevant rights to use Martha Graham's name, that applying licensee estoppel would be inequitable, and that the provisions of the Agreement between the plaintiffs and the defendants did not prevent the defendants from asserting their ownership rights.

### DISCUSSION

I. Rights of the Center and the School to the MG Marks

A. The Center

■ The plaintiffs first contend that the District Court erred in concluding that Martha Graham assigned her name to the Center. The plaintiffs assert that Graham merely transferred to the Center a revocable, gratuitous license to use her name, and that as licensor, Graham could revoke the Center's use of her name. The plaintiffs further maintain that when Graham died, Protas inherited the right to revoke the license Graham gave.

■ Under New York law, a valid assignment does not require incantation of any special language. *Leon v. Martinez*, 84 N.Y.2d 83, 88, 614 N.Y.S.2d 972, 638

N.E.2d 511 (1994) ("No particular words are necessary to effect an assignment; it is only required that there be a perfected transaction between the assignor and assignee, intended by those parties to vest in the assignee a present right in the things assigned."). Indeed, the word assignment need not be used, *see id.,* and the assignment may be oral, *see Speed Prods. Co. v. Tinnerman Prods., Inc.,* 179 F.2d 778, 782 (2d Cir.1949).

In its comprehensive and thoughtful opinion, the District Court concluded that Graham's consent to the School's use of her name in 1948 was not a license, but rather constituted an irrevocable assignment. *Martha Graham Sch.,* 153 F.Supp.2d at 526. There is sufficient evidence in the record to sustain the conclusion that Graham assigned to the Center the rights to use her name in connection with the Center. First, as the District Court pointed out, there is no evidence that during her life Graham was paid a licensing fee for the use of her name. *Id.* Furthermore, there is no evidence that Graham sought to retain the ability to revoke her name from the Center. *Id.* Indeed, the transfer of rights contained no term of use or expiration date. Rather, the evidence shows that Graham consented to the "use of her name in said corporate title," *id.* at 515, and never tried to revoke that consent, *id.* at 526. By its nature, this consent indicated Graham's intention to give her name to the Center for as long as the Center existed.[2] That the Center could exist indefinitely under the same name is clear. *See* New York Not–For–Profit Corporation Law ("NPCL") § 202(a) (2002) (formerly Gen. Corp. Law § 14(1)) and NPCL § 801 (under New York law, a charitable organization may continue indefinitely in the name under which it is incorporated unless steps are taken to change its name). Thus, the District Court did not err in concluding that Graham assigned her name to the Center, and that the Center possesses the rights to use Graham's name.

## B. The School

■ Second, the plaintiffs argue that Graham's sale of her sole proprietorship to the School in 1956 did not thereby transfer to the School rights to her name for use by a school. The plaintiffs assert that neither the testimony of Graham's accountant at the time of the sale nor the documentary evidence concerning the sale sustain such a conclusion.

But the District Court had ample evidence to hold that Graham sold the use of her name to the School in 1956. First, the District Court observed that Graham's accountant at the time "testified very credibly that he advised Graham to sell her going concern, Martha Graham School of Dance, including its name, goodwill, assets and operations, to a newly created not-for-profit entity." *Martha Graham Sch.,* 153 F.Supp.2d at 526. In addition, the District Court found that documentary evidence, including Board minutes and Graham's tax returns, corroborated the accountant's testimony. *Id.* at 526–27.

The accountant's testimony was also bolstered by a letter, prepared by the School's attorneys in 1958, to challenge the IRS's initial decision to deny the School tax exempt status (the "Protest"). According to the Protest, the School bought Graham's sole proprietorship "as a going concern and for the exclusive right to use her name in the name of the School...."

---

**2.** Graham envisioned that the Center would continue after her death and after Protas' death. In her will, Graham provided that if Protas should predecease her, all of her property would pass to the Center.

*Id.* at 527. The Protest also stated that Graham "agreed not to permit the use of her name professionally or commercially in the name of any other school or institution of learning." *Id.* at 526. In view of the accountant's testimony and the above documentary evidence, the District Court did not err in holding that the School owned the right to use Graham's name.

## II. Licensee Estoppel

Next, the plaintiffs argue that it was error for the District Court to have failed to apply the doctrine of licensee estoppel.

■ The doctrine of licensee estoppel is "an equitable doctrine" under which "[a] licensee who has used a designation under a license from another is ordinarily estopped from asserting ownership of the designation as against the licensor." RESTATEMENT (THIRD) UNFAIR COMPETITION, § 33, cmt. d (1995); *see also Bucky v. Sebo*, 276 A.D. 545, 95 N.Y.S.2d 769, 771 (1st Dep't 1950) ("It has long been the law of this state that a licensee is estopped from challenging the validity of a patent, until he has completely repudiated and renounced the licensing agreement."). Nevertheless, because it is an equitable doctrine a "court remains free to consider the particular circumstances of the case, including the nature of the licensee's claim and the terms of the license." RESTATEMENT (THIRD), § 33.

■ The District Court cited numerous reasons for why it would be inequitable to apply licensee estoppel, including that: (1) Protas provided erroneous and misleading material information to the PTO in registering the MG marks; (2) Protas sought to undermine Graham's intent that her name be used by the Center and the School; (3) Protas breached his duty of loyalty to the Center and School by improperly benefitting himself at the expense of those institutions; (4) the Agreement between the Trust and the Center and School was in place for a short period of time; and (5) the School and Center are not-for-profit institutions which have used the Graham name for almost fifty years. *Martha Graham Sch.*, 153 F.Supp.2d at 520–23. The District Court also found that Protas was not a credible witness. *Id.* at 515. We conclude that the District Court was well within its discretion not to apply licensee estoppel for substantially the reasons it provided.

## III. License Agreement

■ Finally, Protas argues that the terms of the Agreement prevent the Center and the School from asserting rights to the MG marks. Protas points to several clauses in the contract including the no-contest provision, the assignment provision, and the merger clause. However, Protas' strongest argument arises from the assignment provision of the Agreement. That clause provides:

> To the extent any rights to any MG Mark or MG Work is deemed hereafter to accrue to the Center, the School, Company or Ensemble, the Center assigns any or all such rights at such time they may be deemed to accrue, including the goodwill associated therewith, to the Trust.

*Id.* at 523. The District Court construed this language to require the defendants to assign to the plaintiff only rights to the MG works which "hereafter ... accrue." *Id.* at 523–24. Because the Center and School's rights in the MG works vested many years *before* the Agreement, the Court determined that no rights *subsequently* accrued to the Center or the School. *Id.*

However, we conclude that the District Court erred in interpreting the terms of the assignment provision. The provision

does not require assignment of rights which "accrue hereafter" but rather, assignment of rights which are "deemed hereafter to accrue." The word "hereafter" modifies the word "deemed" and clarifies that the Center is required to assign any MG rights to the plaintiff which are *subsequently deemed* or *later adjudicated* to vest in the Center. Thus, were the contract valid, any judicial determination occurring after the Agreement and concluding that the Center has rights to the MG marks would require the Center and the School to assign those rights to the plaintiffs.

Despite the District Court's erroneous interpretation of the assignment clause, we do not believe that the District Court erred in denying an injunction. First, Protas cannot enforce this provision of the contract because Protas explicitly terminated the contract. Under the terms of the Agreement, "[a]ny action short of termination shall not affect any other rights or obligations of the parties." By implication then, termination of the contract would deprive the terminating party of the rights under the Agreement. Moreover, under contract law, the plaintiffs were faced with a choice:

> [W]hen one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages. *Under no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits.*

*Ryan v. Volpone Stamp Co.*, 107 F.Supp.2d 369, 386 (S.D.N.Y.2000) (emphasis supplied); *see ARP Films, Inc. v. Marvel Entm't Group, Inc.*, 952 F.2d 643, 649 (2d Cir.1991) (applying New York law) (noting that a party's decision to continue receiving benefits under the contract is tantamount to an election to affirm the contract). But in the case at hand, the plaintiffs are seeking to do what contract law does not permit them, namely, terminate the Agreement and then enforce the provisions of that Agreement. Once the plaintiffs terminated the Agreement, effective May 25, 2000, they could no longer take advantage of the Agreement's benefits, including the assignment clause. Accordingly, we conclude that the District Court did not err in granting the defendants' motion for summary judgment and denying the plaintiffs' request for an injunction.

For the reasons set forth above, the judgment of the District Court is hereby AFFIRMED.