MARTHA GRAHAM SCHOOL AND DANCE FOUNDATION, INC., Plaintiff–Counterclaim–Defendant–Appellant,

Ronald Protas, individually and as Trustee of the Martha Graham Trust, Plaintiff–Counterclaim–Defendant–Appellant,

v.

MARTHA GRAHAM CENTER OF CONTEMPORARY DANCE, INC., and Martha Graham School of Contemporary Dance, Inc., Defendants–Counter–Claimants–Appellees,

Eliot L. Spitzer, Attorney General of the State of New York, Intervenor–Defendant–Appellee.

Docket Nos. 02–9451(L), 03–7020(CON).

United States Court of Appeals, Second Circuit.

Argued: Jan. 29, 2004.

Decided: Aug. 18, 2004.

**628**

Judd Burstein, New York, NY (David Nimmer, Alison Hajdusiewicz, Irell & Manella, LLP, Los Angeles, Cal., on the brief), for Plaintiffs–Counterclaim–Defendants–Appellants.

Katherine B. Forrest, New York, NY, (Joanne M. Gentile, Cravath, Swaine & Moore LLP, New York, NY, on the brief), for Defendants–Counter–Claimants–Appellees.

Barbara L. Quint, Asst. Atty. Gen., New York, NY (Eliot Spitzer, N.Y. State Atty. Gen., New York, NY, on the brief), for Intervenor–Defendant–Appellee.

Oliver Metzger, New York, NY (Charles L. Kerr, James E. Hough, Morrison & Foerster LLP, New York, NY, on the brief), for amici curiae American Dance Festival, Inc., Gerald Arpino and Gordon Davidson, in support of Plaintiffs-Counterclaim-Defendants-Appellants.

Before: NEWMAN, KEARSE, and POOLER, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal raises several copyright and contract issues relating primarily to dances choreographed by the late Martha Graham, widely regarded as the founder of modern dance. The primary issue is whether the work-for-hire doctrine applies to works created by the principal employee of a corporation that was, in the Appellants' view, "created to serve the creative endeavors of an artistic genius." Br. for Appellants at 20. This and other issues arise on an appeal by Ronald Protas and The Martha Graham School and Dance Foundation, Inc. (collectively "Plaintiffs" or "Appellants") from the November 4, 2002, judgment of the District Court for the Southern District of New York (Miriam Goldman Cedarbaum, District Judge). The Court's principal ruling was that copyrights in most of the 70 dances in dispute belong to Defendants–Appellees Martha Graham Center of Contemporary Dance, Inc. ("the Center") and Martha Graham School of Contemporary Dance, Inc. ("the School") and that the copyright in only one dance belongs to Protas, who is Graham's sole beneficiary under her will.

On the primary issue, we agree with the District Court that the work-for-hire doctrine was properly applied to dances created after 1966. On certain other aspects of the Court's judgment we conclude that a partial reversal or remand is required. We therefore affirm in part, reverse in part, vacate in part, and remand.

### Background

Although Martha Graham had the myth of Ariadne[1] in mind when she selected *Errand into the Maze* as the title for the

---

**1.** Ariadne gave Theseus a ball of thread and instructed him to unravel it as he entered the labyrinth that housed the Minotaur so that Theseus could find his way out after he had slain the Minotaur. The earliest account of this classic Greek myth is from Pherecydes, writing in the fifth century B.C. *See* Timothy Gantz, *Early Greek Myth: A Guide to Literary and Artistic Sources* 264 (1993). Graham looked to Greek mythology for many of her dance titles, *e.g., Andromache, Circe,* and *Persephone.*

dance that she created in 1947, that title is appropriate for the task this litigation presented to the District Court and now presents to this Court. The critical events span sixty-five years, many of the pertinent facts are obscured by inadequate record-keeping, and the copyright issues require consideration of several provisions of both the 1909 and 1976 Copyright Acts, *see* 1909 Copyright Act ("1909 Act"), 17 U.S.C. § 1 *et seq.* (1976) (repealed effective 1978), *reprinted at* 8 *Nimmer on Copyright* ("*Nimmer*") app. 6; Copyright Act of 1976 ("1976 Act"), 17 U.S.C. § 101 *et seq.* (2000), and other statutes.

The District Court's meticulous opinions detail the facts underlying this complex dispute. *See Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.,* 153 F.Supp.2d 512, 514–19 (S.D.N.Y.2001) ("*Graham I*"), *aff'd,* 43 Fed.Appx. 408 (2d Cir.2002); *Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.* ("*Graham II*"), 224 F.Supp.2d 567, 570–82 (S.D.N.Y.2002). We recount some of the background, but refer the reader to Judge Cedarbaum's opinions.

*The Center and the School.* Martha Graham's celebrated career as a dancer, dance instructor, and dance choreographer began in the first third of the twentieth century. In the 1920s, she started a dance company and a dance school, running them as sole proprietorships, and choreographed works for commissions. Graham was very successful, but by the 1940s, for tax reasons and because she wanted to extricate herself from funding and legal matters, she began relying on non-profit corporations, which she led, to support her work.

Eventually, Graham completed her work exclusively through two corporations—the Center and the School. The Center was incorporated in 1948. Initially known as the Martha Graham Foundation for Contemporary Dance, Inc., the corporation was renamed the Martha Graham Center of Contemporary Dance, Inc. in 1968. Graham operated her school as a sole proprietorship until 1956 when she sold it to the Martha Graham School of Contemporary Dance, Inc., which was incorporated in that year. The District Court treated the Center and the School as a single entity for purposes of determining copyright ownership.[2] *See Graham II,* 224 F.Supp.2d at 587–92.

*Protas.* Around 1967, Graham, then in her 70s, became acquainted with Ronald Protas, then a 26–year–old freelance photographer. Protas and Graham became friends, and although Protas had no previous dance background, Graham increasingly trusted him to represent her in both personal and professional matters. Graham installed him as the Center's General Director.

In her last will, signed in 1989, two years before her death, Graham named Protas her executor and, significant to this case, bequeathed to him, in addition to her personal property, her residuary estate, including any rights or interests in "dance works, musical scores, scenery sets, [Graham's] personal papers and the use of [Graham's] name."[3] The will did not identify what these interests might be.

---

2. The Court had ample justification for doing so. The Center and the School were largely operated as if they were one. By 1980, the Center acted as an umbrella organization encompassing the School. The same individuals served on both the Center's and the School's Board of Trustees, and the two corporations filed combined financial statements.

3. The residuary clause stated:
 The residue ... of all of my property, real and personal, of every kind and description and wherever situated, including all property over which I may have power of appointment at the time of my death ... I give, devise and bequeath to my said friend, Ron Protas, if he shall survive me, or, if he shall

*Protas's Trust.* After Graham's death in 1991, Protas became Artistic Director of the Center. In 1992, Protas's lawyers suggested that he ascertain what items of intellectual property had passed to him under Graham's will. He did not do so, but nevertheless asserted ownership of copyrights in all of Graham's dances and of all the sets and properties at issue on this appeal. In 1998, he placed the copyrights in the Martha Graham Trust ("the Trust"), a revocable trust that he had created and of which he was trustee and sole beneficiary.

During the 1990s, the Trust licensed many of the dances and sets to various licensees. In 1993, Protas assigned to the Center 40 percent of what he claimed was his 100 percent interest in the Noguchi sculpture "Herodiade." In 1998, Protas arranged for the Trust to sell numerous properties—books, musical scores, films and tapes of performances and rehearsals of dances, and business and personnel files relating to Graham's work—to the Library of Congress for $500,000.

Although the rest of the Center's Board of Trustees apparently accepted without question Protas's representations with respect to his rights to Graham's properties, donors pressured the Center to remove Protas from its helm. In 1999, the Trust entered into a licensing agreement with the Center, an implicit term of which was Protas's resignation as the Center's Artistic Director. The Trust agreed to give the Center an exclusive license to teach the Martha Graham technique, and a non-exclusive license to present live performances of Graham's dances; to use sets, costumes, and properties; to use Graham's images; and to use the Martha Graham trademark. The Center agreed to give the Trust power to approve the selection of a new Artistic Director. The Center also agreed to keep Protas on the Board, pay him a salary of $55,000 to $72,000 for ten years, and give him prominent billing as Artistic Consultant.

In 2000, when Protas and the Center failed to find a mutually agreeable replacement, the Board voted to remove Protas as Artistic Director. Shortly thereafter, due to severe financial difficulties, the Board voted to suspend operations. Meanwhile, Protas, acting through the Trust, founded the Martha Graham School and Dance Foundation ("S&D Foundation"), originally named The Night Journey Foundation, a not-for-profit corporation.

*Copyright registration certificates.* Between 2000 and 2001, Protas obtained certificates of registration for 30 of Graham's dances as unpublished works. By agreement with the Trust, the S & D Foundation became the exclusive licensee in the United States for live performance of virtually all of Graham's dances and use of the Martha Graham trademarks. During the same time period, the Center also obtained certificates of registration for initial and renewal terms for some of Graham's dances.

*The pending lawsuit.* In 2001, after receiving substantial funding, the Center and the School reopened. Protas then initiated this lawsuit to enjoin the Center and the School from using the Martha Graham trademark, teaching the Martha Graham Technique, and performing 70 of Graham's dances. These 70 dances, with the dates

not survive me, to the Martha Graham Center of Contemporary Dance, Inc.

In connection with any rights or interests in any dance works, musical scores, scenery sets, my personal papers and the use of my name, which may pass to my said friend Ron Protas under this Article IV, I request, but do not enjoin, that he consult with my friends, Linda Hodes, Diane Gray, Halston, Ted Michaelson, Alex Racolin and Lee Traub, regarding the use of such rights or interests.

of their creation, are listed in the Appendix.[4] The Plaintiffs sought a judgment under 28 U.S.C. § 2201(a) declaring that none of these dances was in the public domain, that the Trust owned all rights in these dances, that the S & D Foundation was the current and authorized licensee of such rights, and that any unauthorized use of these dances would constitute willful copyright infringement. The Plaintiffs also sought a judgment declaring Protas to be the sole owner of the sets and jewelry associated with the dances.

The Defendants asserted ownership of the disputed copyrights. They argued that the dances, sets, and costumes at issue belonged to the Center either by virtue of the work-for-hire doctrine or Graham's assignments. As such, the Defendants contended, they were not in Graham's residuary estate, and Protas did not inherit them. The Center's position was supported by Intervenor–Defendant Eliot Spitzer, Attorney General of the State of New York.

*District Court's decision.* In a thorough opinion after a bench trial that considered issues concerning the dance copyrights and ownership of theatrical properties (sets, costumes, and jewelry), the District Court found largely in favor of the Defendants.[5] The Court concluded that the 34 dances that Graham had created during the years she was employed by the School or the Center (1956–1991) were works for hire, and that Graham had assigned to the Center many of the dances that were not

works for hire. *See Graham II*, 224 F.Supp.2d at 587–93, 597.

The Court ruled that licensee estoppel did not preclude the Defendants from obtaining relief. *Graham I*, 153 F.Supp.2d at 519. Even if the 1999 licensing agreement between the Trust and the Center were still in force, which the parties agreed was not the case, the agreement referred to the licensed works only by their listing on an addendum that had not been submitted into evidence and had not even been shown to exist. Thus, the provision of the agreement purporting to license dances from the Trust to the Center had never taken effect. *See Graham II*, 224 F.Supp.2d at 583. The Court also found that many of the certificates of registration obtained by both the Plaintiffs and the Defendants did not constitute *prima facie* evidence of copyright ownership because they were based—sometimes by deliberate misrepresentation—on the incorrect premise that the works were unpublished, and because there were competing certificates. *Id.* at 584–87.

In the end, the Court found that Protas was entitled to a declaration of ownership of only the renewal term of copyright in a single dance, *Seraphic Dialogue*. The Defendants were entitled to a declaration of ownership of copyright in 45 dances. Of these, eighteen, listed in the margin,[6] belonged to the Center by assignment. The other 27 belonged to the Center because they were works for hire, "authored" by the Center for purposes of copyright proprietorship. Sixteen of these, listed in margin,[7] were works for hire under the

---

4. The Appendix lists 71 dances, the 70 dances listed by the Plaintiffs plus *Duets*, a dance within *Frescoes*. *Duets* requires separate consideration. *See* [p. 645], *infra*.

5. The District Court's decision with respect to the trademark issues is set forth in *Graham I*.

6. *Tanagra, Three Gopi Maidens, Harlequinade, Primitive Mysteries, Serenade, Satyric Festival*

*Song, Dream, Saraband, Imperial Gesture, Deep Song, Every Soul Is a Circus, El Penitente, Letter to the World, Punch and the Judy, Salem Shore, Deaths and Entrances, Eye of Anguish,* and *Ardent Song.*

7. *Embattled Garden, Episodes: Part I, Acrobats of God, Phaedra, Secular Games, Legend of Judith, The Witch of Endor, Part Real–Part Dream, Cortege of Eagles, Plain of Prayer, Mendicants of Evening, Jacob's Ladder, Luci-*

1909 Act, and eleven of these, listed in the margin,[8] were works for hire under the 1976 Act. *Id.* at 612–15.

The Court found that ten dances, listed in the margin,[9] were in the public domain for lack of timely renewal, five, listed in the margin,[10] belonged to commissioning parties who were not parties in this action, and ownership of copyrights in nine of the dances, listed in the margin,[11] had not been established.[12] *Id.* The Court also found that the Defendants were entitled to a declaration of ownership of the original Noguchi sets and jewelry for dances created by Graham prior to January 15, 1957, and all non-Noguchi sets and costumes, and ordered the Plaintiffs to return these items. *Id.* at 604–06, 613. Finally, the Court imposed a constructive trust on the proceeds that the Trust had collected from licensing and selling intellectual property created by Graham. *Id.* at 613.

The Plaintiffs' appeal contends that the declaratory judgment and the constructive trust rulings are erroneous because (1) none of the works is a work for hire, and (2) the District Court erred in finding that certain works were published. Further, the Plaintiffs argue that the District Court erred in finding that (3) the Defendants owned the sets and properties and that (4) Protas breached his fiduciary duty to the Defendants.

## Discussion

### I. Overview of copyright law

Because the disposition of Graham's dances involves multiple aspects of copyright law that have evolved significantly over time, we begin with a brief overview of relevant copyright principles.

*Protection for works of choreography.* Explicit federal copyright protection for choreography was not provided until the 1976 Act included "choreographic works" among the categories of works eligible for protection. *See* 17 U.S.C. § 102(a)(4); *Horgan v. Macmillan, Inc.*, 789 F.2d 157, 160 (2d Cir.1986). Under the 1909 Act, choreography could be registered, pursuant to regulations, as a species of "dramatic composition." *Id.* (internal quotations marks omitted). Like other creative works, dances are available for statutory copyright if "fixed in any tangible medium of expression." 17 U.S.C. § 102(a). In this case, the parties do not dispute that all of the 70 dances are eligible for statutory copyright, presumably because they have been filmed or videotaped.[13]

*1909 Act protection.* Under the 1909 Act, applicable to works created before January 1, 1978, *see* 17 U.S.C. § 301(b)(2), state common law copyright provided protection until first publication, and thereaf-

---

fer, *The Scarlet Letter, O Thou Desire Who Art About to Sing,* and *Shadows.*

**8.** *The Owl and the Pussycat, Ecuatorial, Frescoes, Judith (II), Andromache's Lament, Phaedra's Dream, Song, Tangled Night, Persephone, Maple Leaf Rag,* and *The Eyes of the Goddess.*

**9.** *Flute of Krishna, Heretic, Lamentation, Celebration, Frontier, Panorama, Chronicle/Steps in the Street, American Document, Appalachian Spring,* and *Night Journey.*

**10.** *Herodiáde, Dark Meadow, Cave of the Heart, Judith (I),* and *Canticle for Innocent Comedians.*

**11.** *Errand into the Maze, Diversion of Angels, Clytemnestra, Circe, Adorations, Acts of Light, The Rite of Spring, Temptations of the Moon,* and *Night Chant.*

**12.** The District Court found that neither side had shown whether these dances were published with the requisite statutory notice. *Graham II,* 224 F.Supp.2d at 594, 603, 613.

**13.** Another way of "fixing" choreography is through use of a written system of notation. *See Horgan,* 789 F.2d at 160 n. 3.

ter the work was entitled to an initial 28–year term of statutory copyright, provided that adequate statutory notice was given at publication,[14] or appropriate registration and deposit were made, 17 U.S.C. §§ 2, 10, 12, 19, 21, 24 (repealed); *see Shoptalk, Ltd. v. Concorde–New Horizons Corp.*, 168 F.3d 586, 590 (2d Cir.1999). In the absence of adequate statutory notice at publication, the work was injected into the public domain. *See id.* If adequate statutory notice was given, then application for renewal made during the last year of the initial term would extend the copyright for a renewal term of 28 additional years. 17 U.S.C. § 24 (repealed).

*1976 Act protection.* Under the 1976 Act, works that were created on or after January 1, 1978, acquired statutory copyright upon creation. *See* 17 U.S.C. § 302(a). The 1976 Act extended this same protection to works that had been created before January 1, 1978, but were neither in the public domain nor copyrighted as of that date. *See id.* § 303(a).

The 1976 Act created a unitary term for works created after January 1, 1978, and works that were unpublished and unregistered on January 1, 1978. *See* 3 *Nimmer* § 9.05[A][2]. For works that were either in their initial or renewal term on January 1, 1978, the 1976 Act extended the renewal period by nineteen years, but still required timely renewal. *See* 17 U.S.C. § 304, his-

torical and statutory notes (H.R. Rep. 94–1476 (1976)).

Timely renewal was no longer a requirement for renewal terms that began after 1992 (works whose statutory copyright began in 1964 or later), although notice of renewal provided procedural benefits. *See* 2 *Nimmer* § 7.02[C][3]. The Copyright Renewal Act of 1992 ("1992 Renewal Act"), Pub. L. No. 102–307, §§ 101–02, 106 Stat. 264 (codified at 17 U.S.C. § 304(a)-(b)), prospectively eliminated the requirement of timely renewal. *See* 3 *Nimmer* § 9.05[A][2].

The copyright terms of both individually authored works and works for hire in their initial 28–year term on January 1, 1978 (*i.e.*, works that first received statutory copyright between January 1, 1964[15] and December 31, 1977), are automatically renewed for 67 years after the initial 28–year term ends. *See* 17 U.S.C. § 304(a).

For copyrights that were in their initial or renewal term on October 27, 1998, the Sonny Bono Copyright Term Extension Act extended the renewal term for another twenty years. Pub. L. No. 105–298, § 102, 112 Stat. 2827 (1998) (codified at 17 U.S.C. §§ 301, 302, 303, 304).

■ *Works for hire.* Especially pertinent to this appeal are the principles applicable to works for hire. Like all works, those created before January 1, 1978, are subject to the 1909 Act, and those created

---

**14.** The 1976 Act introduced different rules regarding statutory notice, effective on January 1, 1978. With respect to copies published prior to the Berne Convention Implementation Act of 1988 ("BCIA"), Pub.L. No. 100–568, 102 Stat. 2853, § 7 (1988) (effective March 1, 1989), omissions in statutory notice may be cured if "registration for the work has been made before or is made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies ... that are distributed to the public in the United States after the omission has been discovered." 17 U.S.C. § 405(a)(2). Because

the BCIA is prospective, all works (whether created before or after January 1, 1978) published between January 1, 1978, and March 1, 1989, were injected into the public domain unless statutory notice was made within five years of publication. All works published after March 1, 1989, do not require statutory notice. *See* 2 *Nimmer* § 7.02[C][2].

**15.** The 1992 Renewal Act does not apply to works whose initial term began prior to 1964, because it applies only prospectively; 28 years before 1992 was 1964. *See* 3 *Nimmer* § 9.05[A][2].

on or after January 1, 1978, are subject to the 1976 Act. *See Playboy Enterprises, Inc. v. Dumas,* 53 F.3d 549, 553 (2d Cir. 1995). With respect to both statutes, the applicable principles operate as default rules, determining who owns the copyright in the event that a contract does not specify ownership.

The 1909 Act provides no definition of "work made for hire," but it states the consequence of that designation. "[T]he word 'author' shall include an employer in the case of works made for hire." 17 U.S.C. § 26 (repealed). Thus, with respect to works for hire, the employer is legally regarded as the "author," as distinguished from the creator of the work, whom Learned Hand referred to as "the 'author' in the colloquial sense." *Shapiro, Bernstein & Co. v. Bryan,* 123 F.2d 697, 699 (2d Cir.1941).

If a work is a work for hire under the 1909 Act, the employer as statutory "author" owns the original term, and the renewal term vests in the employer if the employer makes an application for renewal within the last year of the original term.[16] *See* 17 U.S.C. § 24 (repealed).

In determining whether a work is a work for hire under the 1909 Act, we have generally applied the "instance and expense"test.[17] The copyright belongs to the

---

**16.** Under the 1976 Act, in the absence of a renewal application by the employer for a work for hire, renewal vests in "the person or entity that was the proprietor of the copyright as of the last day of the original term of the copyright." 17 U.S.C. § 304(a)(2)(A)(ii).

**17.** As far as we have been able to determine, the phrase "instance and expense" first entered the lexicon of copyright jurisprudence in *Hanson v. Jaccard Jewelry Co.,* 32 F. 202, 202 (C.C.E.D. Mo.1887), and was first used in an operative sense in a provision of a draft bill prepared in October 1905 by Thorvald Solberg, then the Register of Copyrights. The provision would have provided a 50–year term for "a composite or collective work, such as an encyclopedia, a 'library,' or 'series' produced at the instance and expense of a publisher ...." Library of Congress, *Memorandum Draft of a Bill to Amend and Consolidate the Acts Respecting Copyright,* Copyright Office Bulletin No. 10 (1905). Solberg's next draft bill, ultimately introduced as S. 6330, H.R. 19853, 59th Cong., 1st Sess. (1906), omitted the phrase, referring more generally to "any composite or collective work."

The next use of the phrase we have located appears in the 1964 edition of Prof. Nimmer's treatise. Although the loose-leaf page from that edition has not been located, our Court provided this summary in 1966:

> Professor Nimmer, in his treatise on copyright law, states that there is a presumption in the absence of an express contractual reservation to the contrary, that the copyright shall be in the person at whose instance and expense the work

is done. *Nimmer on Copyright* 238 (1964).

*Brattleboro Publishing Co. v. Winmill Publishing Corp.,* 369 F.2d 565, 567 (2d Cir.1966).

The previous year, 1965, the phrase first appeared in a reported appellate opinion:

> [W]e believe that when one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.

*Lin–Brook Builders Hardware v. Gertler,* 352 F.2d 298, 300 (9th Cir.1965).

*Lin–Brook* applied the phrase to determine that the party commissioning a work by an independent contractor was entitled to the copyright, although the Ninth Circuit stated, without explanation or citation of authority, that the test applied whether the work was created by an independent contractor or an employee. As authority for its use of the phrase, the Ninth Circuit cited our opinion in *Yardley v. Houghton Mifflin Co.,* 108 F.2d 28 (2d Cir.1939), and two district court opinions, *Grant v. Kellogg Co.,* 58 F.Supp. 48 (S.D.N.Y. 1944) and *Dielman v. White,* 102 F. 892 (C.C.D.Mass.1900). None of these opinions used the phrase "instance and expense." *Yardley* ruled that a painting was a work for hire where a school board had selected an artist and paid him for the commissioned work. *Grant* and *Dielman* also involved commissioned works.

person at whose "instance and expense" the work was created. *See Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565, 567 (2d Cir.1966). *Brattleboro* expressed the view that the "instance and expense" test determined work-for-hire status, whether the work was created by a traditional employee or an independent contractor.[18] *See id.* at 568.

▮ A work is made at the hiring party's "instance and expense" when the employer induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out. *See Playboy*, 53 F.3d at 554; *Brattleboro*, 369 F.2d at 568. The *right* to direct and supervise the manner in which work is created need never be exercised. *See Scherr v. Universal Match Corp.*, 417 F.2d

497, 500–01 (2d Cir.1969) (Army's power to supervise Army artists need not have been exercised for their sculpture to be a work for hire).

We have recognized that under the 1909 Act a person could be an employee yet create a work "as a special job assignment, outside the line of [the employee's] regular duties." *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 221 F.2d 569, 570 (2d Cir.), *modified on other grounds*, 223 F.2d 252 (2d Cir.1955) (*"Shapiro/Vogel"*). In that event, the work is not a work for hire.[19] *See id.*

The concept of "work made for hire" remains in the 1976 Act, which defines the phrase to mean "a work prepared by an employee within the scope of his or her employment" or, for certain types of works, "a work specially ordered or commissioned." 17 U.S.C. § 101.[20] In *Com-*

---

A year after *Lin–Brook*, our Court also stated that the "instance and expense" test applied to determine work-for-hire status whether the creator of the work was an independent contractor or an employee, although the case involved only an independent contractor. *Brattleboro*, 369 F.2d at 567–68 (citing *Nimmer on Copyright* 238, 244 (1964)). Although Prof. Nimmer was referring to the test for determining when copyright in the work of an independent contractor belonged to the commissioning party, *Brattleboro* appeared to generalize the test to apply to all work-for-hire situations. Indeed, *Brattleboro* reversed the initial application of the phrase by starting from the premise that the "instance and expense" test applies to the work of an employee and then applying the test to the work of an independent contractor. *See Brattleboro*, 369 F.2d at 567–68.

18. For further discussion of commissioned works by independent contractors under the 1909 Act, *see Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 158–63 (2d Cir.2003).

19. In *Shapiro/Vogel*, the employer had purchased the copyright for the initial term of the employee's work, a song lyric, by paying the employee $25 to write the lyric. Because this payment was in addition to his salary and the lyric-writing was a special job assignment, the

lyric was not considered a work for hire, and the employer therefore did not own the renewal term. 221 F.2d at 570.

20. The 1976 Act defines a "work made for hire" as

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101.

The 1976 Act was the product of extensive negotiations by representatives of the entertainment industry and of authors. *See, e.g.*, Jessica D. Litman, *Copyright, Compromise, and Legislative History*, 72 Cornell L. Rev. 857, 859, 888–91 (1987). Their negotiations with respect to work for hire resulted in the exclusion of work for hire from certain possibilities of recapture by the creating author, to the disadvantage of those authors. In exchange, and to the advantage of authors,

*munity for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) ("*CCNV*"), the Supreme Court ruled that whether a person had created a work as an " 'employee within the scope of his or her employment,' " *id.* at 732, 109 S.Ct. 2166, was to be determined by reference to the common law of agency, and the non-exhaustive factors listed in section 220(2) of the Restatement (Second) of Agency (1958),[21] *see id.* at 738–41, 751–52, 109 S.Ct. 2166 (quoting 17 U.S.C. § 101). The Supreme Court also noted the following factors, among others: "whether the hiring party has the right to assign additional projects to the hired party," "the hired party's role in hiring and paying assistants," "the provision of employee benefits," and "the tax treatment of the hired party." *Id.* at 751–52, 109 S.Ct. 2166.

■ Thus, under both the 1909 and 1976 Acts, a person's status as an employee

renders a work created within the scope of employment as a work for hire, as to which the copyright belongs to the employer (in the absence of a contract providing otherwise). Indeed, this was so before the 1909 Act. *See Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 248, 23 S.Ct. 298, 47 L.Ed. 460 (1903) ("There was evidence warranting the inference that the designs belonged to the plaintiffs, they having been produced by persons employed and paid by the plaintiffs in their establishment to make those very things.").

II. Application of Work–for–Hire Principles

The District Court ruled that nineteen of Graham's dances, listed in the margin,[22] were works for hire under the 1909 Act, *Graham II,* 224 F.Supp.2d at 590, and fifteen, listed in the margin,[23] were works for hire under the 1976 Act, *see id.* at 592.

---

work for hire was narrowed to exclude most commissioned works. *See id.* at 889.

**21.** The Restatement's factors are:
 (a) the extent of control which, by the agreement, the [hiring party] may exercise over the details of the work;
 (b) whether or not the one employed is engaged in a distinct occupation or business;
 (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
 (d) the skill required in the particular occupation;
 (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
 (f) the length of time for which the person is employed;
 (g) the method of payment, whether by the time or by the job;
 (h) whether or not the work is a part of the regular business of the employer;
 (i) whether or not the parties believe they are creating the relation of master and servant; and

 (j) whether the principal is or is not in business.
Restatement (Second) of Agency § 220(2).
 Our Court has accorded particular significance to the factors of
 (1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party.
*Aymes v. Bonelli,* 980 F.2d 857, 861 (2d Cir. 1992).

**22.** *Embattled Garden, Clytemnestra, Episodes: Part I, Acrobats of God, Phaedra, Secular Games, Legend of Judith, Circe, The Witch of Endor, Part Real–Part Dream, Cortege of Eagles, Plain of Prayer, Mendicants of Evening, Jacob's Ladder, Lucifer, The Scarlet Letter, Adorations, O Thou Desire Who Art About to Sing,* and *Shadows.*

**23.** *The Owl and the Pussycat, Ecuatorial, Frescoes, Judith (II), Acts of Light, Andromache's Lament, Phaedra's Dream, The Rite of Spring, Song, Tangled Night, Temptations of the Moon,*

As discussed in Part IV, *infra*, the District Court ultimately found that seven of these dances belonged to none of the parties because of insufficient evidence as to whether the statutory notice requirements had been met when the dances were first published.[24]

■ *Graham's pre–1956 dances.* It is clear, as the District Court indicated, that Graham's 36 dances created before 1956 were not made for hire. *See id.* at 594. Prior to 1956, Graham was not an employee of either the School or the Center. The School did not exist until 1956. The Center, then called the Martha Graham Foundation for Contemporary Dance, Inc., did exist, having been incorporated in 1948. However, although the Center supported Graham's work by promoting and disseminating her technique and by raising and managing funds for performances of the Martha Graham Dance Company, the Center did not hire Graham prior to 1956 in any capacity, either as a traditional employee or as an independent contractor. Dances created by Graham prior to 1956 were therefore not works for hire, and, as far as the record discloses, the copyrights

in them originally belonged to Graham[25] until they entered the public domain for lack of renewal[26] or unless she assigned them to the Center, *see* Part III, *infra*.

■ *Graham's dances created from 1956 through 1965.* Graham choreographed ten dances from 1956 through 1965. The District Court found that all ten of these, listed in the margin,[27] were works for hire under the 1909 Act.[28] *Graham II*, 224 F.Supp.2d at 587, 590. For the following reasons, we conclude that in this respect the District Court erred.

Although Graham was an employee of the School from 1956 through 1965, she was only a part-time employee, and, more significantly, we see no evidence that the scope of her employment included choreography. After the transfer of Graham's school to the corporation formed in 1956 for the purposes of teaching, researching, promoting, and creating dance through composition, commission, and performance, the newly incorporated School engaged Graham as its Program Director. Her salary was $15,000 per year for a term of ten years (from 1956 to 1966) for which she was obligated to give the School ap-

---

*Persephone, Night Chant, Maple Leaf Rag,* and *The Eyes of the Goddess.*

24. These seven dances are the last seven of the nine dances listed in footnote 11, *supra;* the first two, created before 1955, were not found to be works for hire.

25. The District Court found that neither party established ownership of five dances: *Herodiade, Dark Meadow, Cave of the Heart, Judith (I),* and *Canticle For Innocent Comedians,* which were commissioned works. *Graham II,* 224 F.Supp.2d at 570, 595. The District Court also found that neither party established ownership of *Errand into the Maze* and *Diversion of Angels,* because there was no evidence of adequate statutory notice. *Id.* at 603. We affirm these rulings.

26. The District Court found that ten of the pre–1956 dances were published before January 1, 1964: *Flute of Krishna, Heretic, Lamen-*

tation, *Celebration, Frontier, Panorama, Chronicle/Steps in the Street, American Document, Appalachian Spring,* and *Night Journey.* The District Court found that these dances were in the public domain for lack of renewal. *Graham II,* 224 F.Supp.2d at 595. We affirm that ruling. As discussed in Part IV, *infra,* we rule that *Tanagra* was also published before January 1, 1964, and remand for further determination as to its ownership.

27. *Embattled Garden, Clytemnestra, Episodes: Part I, Acrobats of God, Phaedra, Secular Games, Legend of Judith, Circe, The Witch of Endor,* and *Part Real–Part Dream.*

28. The District Court's finding covers nineteen dances that Graham created "before January 1, 1978[,] while she was [the Defendants'] employee." *Graham II,* 224 F.Supp.2d at 590. These nineteen dances, created during Graham's employment after

proximately one-third of her professional time each year. Although part of the School's purpose was the creation of dances, Graham's employment, per her contract, was only to teach and supervise the School's educational program, and not to choreograph. Indeed, during these ten years, Graham continued to receive income from other organizations for her dance teaching and choreography.

Graham's regular employment duties did not oblige her to create dances from 1956 through 1965, and there is no evidence that the School (her part-time employer) or the Center commissioned her to create these dances at their instance or "as a special job assignment, outside the line of [her] regular duties," *Shapiro/Vogel*, 221 F.2d at 570. Although the Defendants contend that the Center suggested dances for Graham to create during the period of her employment, each of their references to the evidence concerns events occurring after 1965. It may well be that the resources of the Center—notably, its rehearsal space and the dancers enrolled at the School—significantly aided Graham in her choreography, thereby arguably satisfying the "expense" component of the "instance and expense" test, but no dances were proved to have been created before 1966 at the "instance" of the Center.

Apparently having assumed that Graham's employment contract prior to 1966 included creation of choreography,[29] the District Court determined copyright ownership for the ten dances Graham choreographed from 1956 through 1965 by considering the publication status of these dances. Three of the dances had been published. The District Court found that neither side had established ownership for two of them, *Clytemnestra* and *Circe*, because it was insufficiently proved that these dances had been published with the required statutory notice of copyright. *Graham II*, 224 F.Supp.2d at 594. One dance, *Acrobats of God*, was the only one of the three with the required statutory notice. *Id.* We agree with the District Court's findings with respect to publication and notice.[30] *See Graham II*, 224 F.Supp.2d at 613.

Our disagreement with the District Court's work-for-hire ruling with respect to the ten dances created during Graham's part-time employment with the Center and our general agreement with the Court's publication and notice rulings as to the three of those dances that were published leads to the following disposition. We vacate the District Court's judgment with respect to the seven works, listed in the margin,[31] created from 1956 through 1965 that were unpublished, and remand for the

---

1956 and before January 1, 1978, include the ten dances created from 1956 through 1965.

**29.** *See Graham II*, 224 F.Supp.2d at 592 (referring to Graham's "35 years as a regular employee of defendants").

**30.** If *Circe* was published after March 1, 1989, the effective date of the BCIA, statutory notice would not be required. The District Court found only that *Circe* was published "[b]efore 1993," *Graham II*, 224 F.Supp.2d at 593, and we have found no evidence to make the date of publication more precise. Thus, we are unable to say that *Circe* was published after March 1, 1989, and exempt from the statutory notice requirement.

The District Court deemed *Acrobats of God* a work for hire, and found that the copyright notice in the Center's name preserved the Center's copyright in it. Although we are ruling that *Acrobats of God*, created before Graham's 1966 contract, was not a work for hire and that the copyright belonged to Graham, the copyright notice in the Center's name was sufficient to preserve Graham's copyright. *See Goodis v. United Artists Television, Inc.*, 425 F.2d 397, 402–03 (2d Cir. 1970). For the disposition of the copyright in this dance, *see* Part V, *infra*.

**31.** *Embattled Garden, Episodes: Part I, Phaedra, Secular Games, Legend of Judith, The Witch of Endor,* and *Part Real–Part Dream.*

District Court to determine whether Graham assigned any of these seven works to the Center, or whether they passed to Protas through Graham's residuary estate. We affirm the judgment with respect to *Clytemnestra* and *Circe*. We reverse the judgment with respect to *Acrobats of God*.

■ *Graham's dances created from 1966 through 1977*. The District Court found that the copyrights in all nine works created by Graham from 1966 through 1977, listed in the margin,[32] were made for hire and initially belonged to the Center.[33] Before considering the Appellants' challenge to this ruling, we set forth more of the facts concerning Graham's status as a full-time employee after 1966.

After Graham's initial ten-year contract with the School expired, she was rehired for another ten-year term from 1966 to 1976. Rather than renew her former contract with the School, Graham signed a new contract with the Center that altered both the nature and extent of her employment from part-time dance instructor to full-time choreographer. Her new contract was renewed indefinitely in 1976.

As reflected in the change of Graham's title from Program Director of the School to Artistic Director of the Center, Graham's duties became focused on choreography, rather than on teaching. The Center's Board of Directors urged Graham to complete "[a]s many [new dances] as possible," and "[t]each[ ] [only] when permitted by schedule." The Board even suggested possible themes for new dances for Graham to choreograph. Graham's employment also shifted from part-time to full-time, with a substantial increase in salary. We see nothing in the record to indicate that after 1966 Graham choreographed dances on commission for third parties. Graham remained the Center's Artistic Director, as well as Chief Executive, until her death in 1991.

Graham's status as an employee of the Center with contractual duties to create dances gives rise to the principal issue on this appeal: whether the dances she created from 1966 through 1977 (and, as we discuss in the next section, from 1978 through 1991) were works for hire belonging to the Center under traditional doctrine or whether, as the Appellants contend, the work-for-hire doctrine is inapplicable in view of Graham's central role with that entity. The Appellants argue that she was not an employee within the scope of the 1909 Act. Even if Graham was technically a salaried employee of the Center, and even if she undeniably choreographed dances at the Center's expense, the Appellants contend that she choreographed at no one's instance but her own. The *Amici Curiae*[34] put the argument even more strongly, contending that "[t]he better result would be to apply the work-for-hire doctrine only cautiously, if at all, in situations where the putative 'employer' is a not-for-profit corporation formed for the purpose of encouraging and supporting authors in their creative endeavors." Br. for *Amici Curiae* at 2.

32. *Cortege of Eagles, Plain of Prayer, Mendicants of Evening, Jacob's Ladder, Lucifer, The Scarlet Letter, Adorations, O Thou Desire Who Art About to Sing,* and *Shadows.*

33. The District Court's finding covers nineteen dances that Graham created "before January 1, 1978[,] while she was [the Defendants'] employee." *Graham II,* 224 F.Supp.2d at 590. These nineteen dances, created during Graham's employment after 1956 and before January 1, 1978, include the nine dances created from 1966 through 1977.

34. *Amici Curiae* are the American Dance Festival, Inc., a not-for-profit corporation committed to promoting the art of dance, founded in part by Graham; Gerald Arpino, Artistic Director of the Joffrey Ballet of Chicago; and Gordon Davidson, Artistic Director of the Center Theatre Group/Mark Taper Forum of the Los Angeles County Music Center.

The argument of the Appellants and the *Amici* is not without some appeal, at least as a matter of creative arts policy. We understand their point that where a corporation is formed for the purpose of fostering a supportive environment in which an employed artist will have the opportunity to create new works, the default rule should leave the copyrights in the new works with the employee, and place on the employer the burden of pursuing a contract to obtain her copyrights. Whatever the intrinsic merit of such an approach, we conclude that its adoption is a matter of legislative choice for Congress in the future, not statutory interpretation for a court at present. We turn then to an assessment of Graham's role under prevailing work-for-hire principles.

No doubt Graham was a self-motivator, and perhaps she would have choreographed her dances without the salary of Artistic Director, without the Center's support and encouragement, and without the existence of the Center at all, but all that is beside the point. The fact is that the Center did employ her to do the work, and she did the work in the course of her regular employment with the Center. Where an artist has entered into an explicit employment agreement to create works, works that she creates under that agreement cannot be exempted from the work-for-hire doctrine on speculation about what she would have accomplished if she had not been so employed.

It is true that as the revered doyenne, Graham held remarkable sway over the Center's Board of Directors. However, Graham went to great lengths to become an employee of the Center so that she could insulate herself from the legal and financial aspects of her work. As an employee, Graham could have been discharged by the Center, even though that prospect was unlikely, and, for her part, Graham could have relinquished the support of a regular salary by electing to leave the Center.

The Appellants contend that Graham's role with the Center is more distant from a work-for-hire relationship than that of the monk whose writings and religious lectures the Ninth Circuit ruled were not works for hire under the 1909 Act, even though at the time of their creation the monk was supported by the church that he had founded. *See Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, 206 F.3d 1322 (9th Cir.2000) ("*SRF Church*"). Whether or not we would agree with *SRF Church*, we view it, as did the Ninth Circuit, as involving a person with much less of a connection to his "employer" church than would obtain in a "traditional [employment] relationship." *Id.* at 1326–27. The monk was a religious leader who lived under a vow of poverty in quarters provided by the church that he founded and headed. He received a small monthly stipend, having renounced in writing any claim for compensation. *See id.* at 1324–25. In contrast, Graham received a salary specifically to create the intellectual property at issue in this litigation. After 1966, the Center paid Graham to be its Artistic Director, and her primary duty was to choreograph new dances.

■ In arguing that Graham's dances were not created at the "instance" of the Center, the Appellants endeavor to give that word a more particularized meaning than is appropriate for the context in which the "instance and expense" test applies. There is no need for the employer to be the precipitating force behind each work created by a salaried employee, acting within the scope of her regular employment. Many talented people, whether creative artists or leaders of major corporations, are expected by their employers to produce the sort of work for which they were hired, without any need for the em-

ployer to suggest any particular project. "Instance" is not a term of exclusion as applied to specific works created within the scope of regular employment. It may have more significance in determining whether an employee's work somewhat beyond such scope has been created at the employer's behest or to serve the employer's interests, *see Avtec Systems, Inc. v. Peiffer*, 21 F.3d 568, 572–74 (4th Cir.1994) (remanding for reconsideration of whether employee's creation of computer program was motivated by desire to further employer's corporate goals); 1 *Nimmer* § 5.03[B][1][b][I], or whether a work has been "specially ordered or commissioned" under the 1976 Act, 17 U.S.C. § 101 ("work made for hire"); *Playboy*, 53 F.3d at 562 ("[T]he phrase 'specially ordered or commissioned' has essentially the same meaning as 'instance and expense.' ").

Of course, the presumption that, under the 1909 Act, Graham's post–1966 dances were made for hire may be rebutted by sufficient proof, for example, evidence that Graham personally received royalties for her dances. The Plaintiffs offered some evidence to prove that Graham received royalties for dances created after 1966, but the District Court, with ample justification, declined to credit such evidence.

■■■ We agree with the District Court that the dances created from 1966 through 1977 are works for hire.[35]

■■■ *Graham's dances created from 1978 through 1991.* Dances created by Graham from 1978 through 1991 are subject to the 1976 Act. Applying the teachings of *CCNV*, the District Court made findings as to Graham's status as an employee that are fully supported by the record, and we agree with the Court's conclusion that under the factors listed in the Restatement (Second) of Agency, Graham's dances created from 1978 through 1991, listed in the margin,[36] were works for hire. *See Graham II*, 224 F.Supp.2d at 591–92.

Several factors, including ones to which we have accorded particular significance, weigh in favor of finding an employment relation between Graham and the Center. During the entire interval from 1978 to 1991, Graham continued as the Center's Artistic Director. She received employee benefits and reimbursement for personal expenses, travel, and medical benefits, and a regular salary "[t]o make dances." Trial transcript 223 (testimony of Lee Traub). The Center routinely withheld income and social security taxes from her salary. Graham created her dances on the Center's premises and with the Center's resources. Graham's choreography was also the regular activity of the Center. All these factors weigh in favor of finding an employ-

---

**35.** Two of the works in this group, *Cortege of Eagles* and *Adorations*, were published. The District Court ruled that the copyright in *Cortege of Eagles* belongs to the Center. *Graham II*, 224 F.Supp.2d at 594. We agree. Upon creation of that dance in 1967, the copyright initially belonged to the Center. It was published in 1969 with the required statutory notice in the Center's name as part of a video called *3 by Martha Graham*. The renewal term automatically began in 1997, *see* 17 U.S.C. § 304(a), and the Center placed a notice of renewal with the Copyright Office in 2001. The District Court found that neither party had proved that *Adorations* was publish-

ed in 1976 with the required statutory notice. *Graham II*, 224 F.Supp.2d at 593–94. We affirm both rulings.

We agree that the remaining dances—*Plain of Prayer, Mendicants of Evening, Jacob's Ladder, Lucifer, The Scarlet Letter, O Thou Desire Who Art About to Sing*, and *Shadows*—are works for hire under the 1909 Act.

**36.** *The Owl and the Pussycat, Ecuatorial, Frescoes, Judith (II), Acts of Light, Andromache's Lament, Phaedra's Dream, The Rite of Spring, Song, Tangled Night, Temptations of the Moon, Persephone, Night Chant, Maple Leaf Rag*, and *The Eyes of the Goddess*.

ment relation between Graham and the Center.

■ It is true that the Center did not exercise much control over Graham, but the absence of a hiring party's *exercise* of control does not mean that an artist is not an employee where other factors weigh in favor of finding an employment relationship. In *Carter v. Helmsley–Spear, Inc.*, 71 F.3d 77, 85–88 (2d Cir.1995), we ruled that an elaborate sculpture was a work for hire under the 1976 Act despite the fact that the artists "had complete artistic freedom with respect to every aspect of the sculpture's creation," *id.* at 86.

The fact that Graham was extremely talented understandably explains the Center's disinclination to exercise control over the details of her work, but does not preclude the sort of employee relationship that results in a work for hire. The Restatement (Second) of Agency notes that there are many occupations in which the employer would not normally exercise control over the details of the employee's work. The "control or right to control needed to establish the relation of master and servant may be very attenuated." Restatement (Second) of Agency § 220(1) cmt. d (1958). The Restatement offers the example of a "full-time cook" over whose culinary activity "it is understood that the employer will exercise no control." *Id.* The Restatement further notes that "ship captains and managers of great corporations are normally superior servants, differing only in the dignity and importance of their positions from those working under them." *Id.* § 220(1) cmt. a.

Our reasons for rejecting the Appellants' argument that Graham's artistic talent and the Center's purpose to promote her art do not exempt her dances from the work-for-hire principles of the 1909 Act apply equally to the status of her dances governed by the 1976 Act. Graham's fifteen dances created in and after 1978 were properly found to be works for hire.

Having found that these fifteen dances were works for hire, the District Court determined whether the Center was entitled to a declaration of ownership by considering whether they were published and, if so, whether they were published with required notice. The Court found that five dances, listed in the margin,[37] were published, but that four of these had not been shown to have been published with notice, and that one, *Maple Leaf Rag*, did not require notice under the BCIA because it was published in 1991. The Court therefore ruled that the ten unpublished dances, listed in the margin,[38] and *Maple Leaf Rag* were within the group that belonged to the Center. *Graham II*, 224 F.Supp.2d at 587, 592–94. We affirm that ruling. Within one of the unpublished dances, *Frescoes*, is what may well be a distinct dance, *Duets*, which was published, as we explain in Part IV, *infra*. As to that dance, *Duets*, we remand for determination of whether (1) *Duets* is a distinct dance within the dance *Frescoes*, and (2) if so, whether *Duets* was published with the requisite notice.

---

**37.** *Acts of Light, The Rite of Spring, Temptations of the Moon, Night Chant,* and *Maple Leaf Rag. Acts of Light* was published in 1984, thus requiring notice. As the District Court found, *The Rite of Spring, Temptations of the Moon,* and *Night Chant* were published before 1993, *see Graham II,* 224 F.Supp.2d at 613, but there is no evidence showing that they were published after March 1, 1989, the effective date of the BCIA, and thus exempt from the requirement of statutory notice.

**38.** *The Owl and the Pussycat, Ecuatorial, Frescoes* (except for *Duets,* which we rule was published and which we remand for determination of ownership), *Judith II, Andromache's Lament, Phaedra's Dream, Song, Tangled Night, Persephone,* and *The Eyes of the Goddess.*

## III. Assignment

■ The Appellants contend that the District Court erred in finding that Graham assigned to the Center 21 dances, listed in the margin,[39] which were created before 1956, unpublished at the time of assignment, and not commissioned, *see Graham II*, 224 F.Supp.2d at 597. We disagree.

■ A valid assignment of statutory copyright must be in writing. *See* 17 U.S.C. § 204(a); *see Jasper v. Bovina Music, Inc.*, 314 F.3d 42, 46–47 (2d Cir.2002). However, we have ruled that assignments of common law copyright need not be in writing. *See Houghton Mifflin Co. v. Stackpole Sons, Inc.*, 104 F.2d 306, 311 (2d Cir.1939) (fact that German publishers had the manuscript of Adolf Hitler's *Mein Kampf* sufficed to imply assignment of common law copyright).

Although there is no document memorializing Graham's assignment of copyright in her pre–1956 dances to the Center, the District Court was entitled to find that Graham assigned to the Center, orally or in writing, her copyrights in her non-commissioned pre–1956 dances that were not published at the time she assigned them. *See Graham II*, 224 F.Supp.2d at 596–601.

■ The District Court relied on several items of evidence to reach its conclusion. *Id.* For example, Jeannette Roosevelt, former President of the Center's board of directors, testified that Graham had given the dances to the Center prior to 1965 or 1966, when she joined the board. There was additional evidence that the Center acted as the owner of the

dances by entering into contracts with third parties, and that Graham was aware of this and did not object. Other evidence showed that the Center received royalties for the dances and treated them as its assets. However, the only evidence that Graham had assigned the entire group of her pre–1956 dances (non-commissioned and unpublished) to the Center are two letters from Lee Leatherman, the Center's Executive Administrator at that time, written in 1968 and 1971. These letters indicated that "[r]ecently Miss Graham assigned performing rights to all of her works to the Martha Graham Center of Contemporary Dance, Inc.," and that "Martha has assigned all rights to all of her works to the Martha Graham Center, Inc." The Appellants contend that these letters are hearsay and were impermissibly considered.

These two letters, both "in existence 20 years or more at the time [they were] offered" as evidence, *see* Fed.R.Evid. 901(b) (8)(C), were authenticated as ancient documents. There was no reason to suspect their authenticity. *See id.* 901(b)(8)(A). Moreover, Linda Hodes, a witness with relevant knowledge, testified that the letters were what they purported to be. *See id.* at 901(b)(1). The letters were therefore exceptions to the hearsay rule. *See id.* at 803(16); *see also id.* at 807. The District Court did not err in admitting and relying on these letters.

■ Under New York law, "an assignment ... may be made without writing or delivery of any written statement of the claim assigned, ... provided only that the

39. *Tanagra, Three Gopi Maidens, Harlequinade, Primitive Mysteries, Serenade, Satyric Festival Song, Dream, Saraband, Imperial Gesture, Deep Song, Every Soul Is a Circus, El Penitente, Letter to the World, Punch and the Judy, Salem Shore, Deaths and Entrances, Errand into the Maze, Diversion of Angels, Eye of Anguish, Ardent Song,* and *Seraphic Dialogue.*

As a result of its conclusion that works created from 1956 through 1965 were works for hire, belonging to the Center, the District Court did not make a finding as to whether Graham assigned these works to the Center.

assignment is founded on a valid consideration between the parties." *Risley v. Phenix Bank,* 83 N.Y. 318, 328 (1881). The District Court was entitled to find that Graham received consideration for the assignment of her pre–1956 dances. Graham benefitted from the Center's assumption of the legal and financial duties associated with her choreography; assigning to the Center the copyrights in her dances gave her what she wished—freedom from the responsibilities of copyright registration and renewal, licensing, collection of royalties, and archival tasks.

The District Court was entitled to find that Graham assigned her pre–1956 dances that had not fallen into the public domain, listed in the margin,[40] to the Center sometime between 1957 and the mid–1960s.

## IV. Publication

The District Court found that sixteen of the pre–1956 dances and ten of the post–1956 dances were published. *Graham II,* 224 F.Supp.2d at 583. The Appellants contend principally that the District Court erred by relying on hearsay to make these findings. We disagree. The District Court properly relied on non-hearsay evidence to determine which dances were published.

The District Court cited five but relied primarily on two documents containing lists of published dances. *Id.* at 580–82. Those documents were (1) a 1993 list prepared by Christina Duda of 21 ballets that had been "filmed and sold"; (2) a 1990 list prepared by Christopher Herrmann of nineteen "commercially produced" films and video tapes; (3) a 1991 letter introduced by Protas; (4) a catalog of the New York Public Library showing that seven of 26 published dances were rented or sold prior to 1975; and (5) a 2001 letter from the Copyright Office raising serious questions regarding the publication status of 26 published dances. *See id.*

 The District Court received the 1993 Duda list in its entirety. The Appellants assert that the list was hearsay and inadmissible. In fact, the list was an admission by a party-opponent, and not hearsay under Fed.R.Evid. 801(d)(2)(D). At trial, Protas admitted that Duda had been his assistant and that the list had been created by Duda in the scope of her employment. The Appellants also argue that Herrmann's list was inadmissible principally because it lacked any indication of authorship. However, Herrmann, who was an assistant to Protas in 1987 and then in charge of archiving films for the Center until 1990, testified that he prepared the list. Both the Duda and Herrmann lists were probative as to whether the works had been published. They were not merely lists of dances that had been filmed, but of films that had been "sold," and films that were "commercially produced."

 The District Court did not exceed its discretion in admitting the five challenged documents. *See Silverstein v. Chase,* 260 F.3d 142, 145 (2d Cir.2001) (setting forth standard of review for evi-

**40.** The District Court found that Graham had assigned 21 dances to the Center. *Graham II,* 224 F.Supp.2d. at 597. Our ruling that *Tanagra* was published before 1966, *see infra,* Part IV, and our agreement with the District Court that neither party established statutory notice (required for ownership) for *Errand into the Maze* and *Diversion of Angels,* leave the following eighteen dances (created before 1956, unpublished at the time of assignment, and not commissioned) within the scope of the District Court's ruling as to assignment by Graham to the Center: *Three Gopi Maidens, Harlequinade, Primitive Mysteries, Serenade, Satyric Festival Song, Dream, Saraband, Imperial Gesture, Deep Song, Every Soul is a Circus, El Penitente, Letter to the World, Punch and the Judy, Salem Shore, Deaths and Entrances, Eye of Anguish, Ardent Song,* and *Seraphic Dialogue.*

dentiary rulings), and we agree with the Court's legal conclusion that the dances listed on these documents were published for purposes of both the 1909 and 1976 Acts. *See* 17 U.S.C. § 101 ("Publication"); *Roy Export Co. v. Columbia Broadcasting System,* 672 F.2d 1095, 1101–02 (2d Cir. 1982) (publication under 1909 Act). However, the Court erred in omitting two dances: *Tanagra,* which was published in the 1920s and *Duets* (from *Frescoes*), which was published in 1979, both of which appear on Herrmann's list. Perhaps the District Court regarded these two dances as unpublished because they are listed under the sub-heading "Films with Producers Unknown." However, this sub-heading is within the overall heading "List of Commercially Produced Films and Video Tapes."

## V. Statutory notice and renewal

The Appellants challenge the District Court's finding of statutory notice and subsequent renewal with respect to a videotape entitled *3 by Martha Graham,* which includes three dances: *Seraphic Dialogue, Acrobats of God,* and *Cortege of Eagles.* The Appellants argue that the Center's statutory notice was defective because it named the Center as the holder of copyright, when, in the Appellants' view, Graham was the owner of the copyrights. As discussed above, at the time of publication, *Seraphic Dialogue* belonged to the Center by assignment, and *Cortege of Eagles* belonged to the Center as a work for hire. Thus, the copyright notice on the video was properly credited to the Center for these two dances.

■ *Acrobats of God* was not a work for hire. Regardless of whether its copyright remained with Graham or had been transferred by assignment to the Center at the time of publication, the statutory notice on the video was adequate to preserve the copyright. An author's copyright is preserved even when the stated party on a copyright notice is not precisely correct. *See Goodis v. United Artists Television, Inc.,* 425 F.2d 397, 403 (2d Cir.1970).

■ Under 17 U.S.C. § 304(a)(2)(B), whether or not timely registration was made, the renewal terms for all three works automatically began in 1998. As for *Cortege of Eagles,* a work for hire belonging to the Center, the renewal term belongs to the Center, under 17 U.S.C. § 304(a)(2)(A), even if it had not applied for renewal certificates in 2001.[41] As for *Seraphic Dialogue* and *Acrobats of God,* even if Graham had assigned the renewal terms to the Center, her death in 1991, prior to the beginning of the renewal term, voided such assignments, and the renewal terms reverted back to the author (*i.e.,* Graham). *See* 17 U.S.C. § 24 (repealed); *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.,* 342 F.3d 149, 157 & n. 7 (2d Cir.2003). As Graham's beneficiary, Protas inherited the copyrights in *Seraphic Dialogue* and *Acrobats of God.* The District Court correctly ruled that Protas owned the copyright in *Seraphic Dialogue.* However, the District Court erred in ruling that *Acrobats of God* belonged to the Center, and we therefore reverse the District Court's decision with respect to this work.

## VI. Other Issues

■ *Theatrical properties.* The Appellants also challenge the District Court's evidentiary basis for finding that Graham assigned her pre–1957 Noguchi sets to the School (as opposed to the Center). The District Court did not err in admitting Graham's January 15, 1957, unsigned letter as an ancient document, and in

**41.** The Center sought renewal certificates for all three works.

crediting its statement that Graham was transferring numerous sets and properties, including the Noguchi sets, to the School. *See Graham II*, 224 F.Supp.2d at 604. The transfer was confirmed in a 1958 Tax Protest submitted to the IRS, stating that Graham had made a considerable donation to the School in 1957, including "the complete theatrical settings for sixteen separate dance-dramas, most of which settings had been executed for her by the celebrated Japanese–American artist, Isamu Noguchi." Graham's reservation of the "full right and priority to use all properties" transferred did not invalidate the assignment. *See generally Conde Nast Publications, Inc. v. United States*, 575 F.2d 400, 402–03 (2d Cir.1978). The Appellants point to numerous items of evidence suggesting that Graham did not assign the properties and continued to own them. However, the majority of this evidence rests on the credibility of Protas, whom the District Court was entitled not to credit.

Because no evidence was presented as to which of the pre–1957 properties Graham might have reserved for herself, the District Court reasonably concluded that all of the theatrical properties in Graham's possession predating January 15, 1957, had been transferred to the Defendants. *Graham II*, 224 F.Supp.2d at 604–06.

The Appellants also challenge the District Court's findings with respect to the post–1957 properties. The Court concluded that the evidence was insufficient for either side to obtain a declaration of ownership with respect to the Noguchi sets and jewelry accompanying dances created after January 15, 1957, and that all of the remaining sets and costumes belong to the Defendants because they had either paid for them or received them as gifts. *Id.* at 606. There is no merit to the Appellants' argument, which consists primarily of an alternate evaluation of the evidence.

■ *Breach of fiduciary duty.* Protas challenges the District Court's finding that he breached his fiduciary duty to the Defendants, in violation of New York's Not-for–Profit Corporation Law § 717(a). *See id.* at 609. We conclude, however, that the District Court did not err in granting the Defendants' counterclaim for breach of Protas's fiduciary duty to the Center. There was evidence that Protas ignored questions that surfaced from several sources about his ownership of the dances, sets, and costumes, and made assertions regarding ownership of these items to the Center's board of directors and to third parties. These assertions were, at best, irresponsibly made, and, at worst, intentionally misleading. Moreover, the Court had ample evidence that Protas sought to register as unpublished works in his own name works that he knew to be published and to belong to the Center.

■ *Constructive trust.* The Appellants also challenge the District Court's imposition of a constructive trust on proceeds from property licensed and sold by the Trust, *see id.* at 613. To the extent that the Trust licensed and sold property that belonged to the Center, the constructive trust is warranted. Under New York law, the equitable remedy of a constructive trust is appropriate when there is clear and convincing evidence of (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer in reliance on such a promise; and (4) unjust enrichment. *Caballero v. Anselmo*, 759 F.Supp. 144, 147 (S.D.N.Y.1991). As the Artistic Director of the Center, Protas was a fiduciary of the Defendants, and this position carried with it an implied promise to act in the Center's best interest. Protas licensed and sold properties that did not belong to him, for his own enrichment. We remand for a recalculation of the amount subject to the constructive trust, in light of the findings the District Court will

make on remand in determining ownership of nine dances.[42]

## Conclusion

We commend the District Court for its careful rulings on the many issues in this complicated case, most of which we affirm. We reverse the District Court's determination of ownership of *Acrobats of God* because its renewal term belongs to Protas.

We vacate and remand to the District Court for determination of ownership with respect to seven dances created between from 1956 through 1965,[43] and two dances that were incorrectly deemed unpublished,[44] and for recalculation of the amount subject to the constructive trust. As to the District Court's rulings on all other dances and all the properties, we affirm. All of our rulings as to the dances are listed in the following Appendix.

## Appendix

| Dance | Date of creation/ publication | Dist. Ct. ruling | Ct. App. ruling |
| --- | --- | --- | --- |
| **Dances created before 1956:** | | | |
| *Tanagra* | 1926/1920s–30s | assigned to Center | remand |
| *Three Gopi Maidens* | 1920s | assigned to Center | affirm |
| *Flute of Krishna* | 1920s/1923 | public domain | affirm |
| *Heretic* | 1929/1930 | public domain | affirm |
| *Lamentation* | 1930/1930 | public domain | affirm |
| *Harlequinade* | 1930 | assigned to Center | affirm |
| *Primitive Mysteries* | 1931 | assigned to Center | affirm |
| *Serenade* | 1931 | assigned to Center | affirm |
| *Satyric Festival Song* | 1932 | assigned to Center | affirm |
| *Celebration* | 1934/1934 | public domain | affirm |
| *Dream* | 1934 | assigned to Center | affirm |
| *Saraband* | 1934 | assigned to Center | affirm |
| *Imperial Gesture* | 1935 | assigned to Center | affirm |
| *Frontier* | 1935/1935 | public domain | affirm |
| *Panorama* | 1935/1935 | public domain | affirm |
| *Chronicle/Steps in the Street* | 1936/1936 | public domain | affirm |
| *Deep Song* | 1937 | assigned to Center | affirm |
| *American Document* | 1938/1938 | public domain | affirm |
| *Every Soul Is a Circus* | 1939 | assigned to Center | affirm |
| *El Penitente* | 1940/1991 | assigned to Center | affirm |
| *Letter to the World* | 1941 | assigned to Center | affirm |
| *Punch and the Judy* | 1941 | assigned to Center | affirm |
| *Salem Shore* | 1943 | assigned to Center | affirm |
| *Deaths and Entrances* | 1943 | assigned to Center | affirm |
| *Appalachian Spring* | 1944/1959 | public domain | affirm |
| *Herodiade* | 1944/1991 | ownership unproved | affirm |
| *Dark Meadow* | 1946 | ownership unproved | affirm |
| *Cave of the Heart* | 1946/1976 | ownership unproved | affirm |
| *Night Journey* | 1947/1960 | public domain | affirm |
| *Errand into the Maze* | 1947/1984 | ownership unproved | affirm |
| *Diversion of Angels* | 1948/1976 | ownership unproved | affirm |
| *Judith (I)* | 1950 | ownership unproved | affirm |

**42.** *See* footnotes 43, 44, *infra.*

**43.** *Embattled Garden, Episodes: Part I, Phaedra, Secular Games, Legend of Judith, The Witch of Endor,* and *Part Real–Part Dream.*

**44.** *Tanagra* and *Duets* (from *Frescoes*).

| | | | |
|---|---|---|---|
| *Eye of Anguish* | 1950 | assigned to Center | affirm |
| *Canticle for Innocent Comedians* | 1952 | ownership unproved | affirm |
| *Ardent Song* | 1954 | assigned to Center | affirm |
| *Seraphic Dialogue* | 1955/1969 | Protas (renewal term) | affirm |

**Dances created from 1956 through 1965:**

| | | | |
|---|---|---|---|
| *Embattled Garden* | 1958 | Center (work for hire) | remand |
| *Clytemnestra* | 1958/1979 | ownership unproved | affirm |
| *Episodes: Part I* | 1959 | Center (work for hire) | remand |
| *Acrobats of God* | 1960/1969 | Center (work for hire) | reverse |
| *Phaedra* | 1962 | Center (work for hire) | remand |
| *Secular Games* | 1962 | Center (work for hire) | remand |
| *Legend of Judith* | 1962 | Center (work for hire) | remand |
| *Circe* | 1963/before 1993 | ownership unproved | affirm |
| *The Witch of Endor* | 1965 | Center (work for hire) | remand |
| *Part Real–Part Dream* | 1965 | Center (work for hire) | remand |

**Dances created from 1966 through 1977:**

| | | | |
|---|---|---|---|
| *Cortege of Eagles* | 1967/1969 | Center (work for hire) | affirm |
| *Plain of Prayer* | 1968 | Center (work for hire) | affirm |
| *Mendicants of Evening* | 1973 | Center (work for hire) | affirm |
| *Jacob's Ladder* | 1974 | Center (work for hire) | affirm |
| *Lucifer* | 1975 | Center (work for hire) | affirm |
| *The Scarlet Letter* | 1975 | Center (work for hire) | affirm |
| *Adorations* | 1975/1976 | ownership unproved | affirm |
| *O Thou Desire Who Art About to Sing* | 1977 | Center (work for hire) | affirm |
| *Shadows* | 1977 | Center (work for hire) | affirm |

**Dances created from 1978 through 1991:**

| | | | |
|---|---|---|---|
| *The Owl and the Pussycat* | 1978 | Center (work for hire) | affirm |
| *Ecuatorial* | 1978 | Center (work for hire) | affirm |
| *Frescoes* (except *Duets* ) | 1978 | Center (work for hire) | affirm |
| *Duets* (from *Frescoes* ) | 1978/1979 | Center (work for hire) | remand |
| *Judith (II)* | 1980 | Center (work for hire) | affirm |
| *Acts of Light* | 1981/1984 | ownership unproved | affirm |
| *Andromache's Lament* | 1982 | Center (work for hire) | affirm |
| *Phaedra's Dream* | 1983 | Center (work for hire) | affirm |
| *The Rite of Spring* | 1984/before 1993 | ownership unproved | affirm |
| *Song* | 1985 | Center (work for hire) | affirm |
| *Tangled Night* | 1986 | Center (work for hire) | affirm |
| *Temptations of the Moon* | 1986/before 1993 | ownership unproved | affirm |
| *Persephone* | 1987 | Center (work for hire) | affirm |
| *Night Chant* | 1988/before 1993 | ownership unproved | affirm |
| *Maple Leaf* | 1990/1991 | Center (work for hire) | affirm |
| *The Eyes of the Goddess* | 1991 | Center (work for hire) | affirm |